No. 22-15677

In the
# United States Court of Appeals
for the Ninth Circuit

AIRLINES FOR AMERICA,

*Plaintiff-Appellant*,

v.

CITY AND COUNTY OF SAN FRANCISCO,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California, Case No. 3:21-cv-02341-EMC,
Hon. Edward M. Chen, *United States District Judge*

## AIRLINES FOR AMERICA'S
## OPENING BRIEF

Jason D. Russell
Zachary M. Faigen
Mitchell A. Hokanson
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
300 South Grand Ave., Ste. 3400
Los Angeles, CA 90071

Patricia N. Vercelli
Riva Parker
AIRLINES FOR AMERICA
1275 Pennsylvania Ave., NW
Washington, DC 20004

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Hanaa Khan
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Plaintiff-Appellant Airlines for America*

# DISCLOSURE STATEMENT

Airlines for America (A4A) is a nonprofit corporation organized under the laws of the District of Columbia, with its principal place of business in Washington, DC. A4A is a trade organization that advocates on behalf of its member air carriers on a wide range of issues relevant to the airline industry, including safety, security, the environment, and customer service. A4A's member airlines include Alaska Airlines, Inc; American Airlines, Inc.; Atlas Air, Inc.; Delta Air Lines, Inc.; FedEx Corporation; Hawaiian Airlines, Inc.; JetBlue Airways Corp.; Southwest Airlines Co.; United Airlines, Inc.; and UPS Airlines.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT...................................................................i

TABLE OF AUTHORITIES............................................................ vi

GLOSSARY ..................................................................................... xiii

REQUEST FOR ORAL ARGUMENT...................................... xiv

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT ....................................................5

STATEMENT OF ISSUES ..................................................................6

PERTINENT STATUTORY PROVISIONS.......................................6

STATEMENT OF THE CASE.............................................................6

    A.    The Board of Supervisors is San Francisco's legislative branch..................................................................................6

    B.    The Airport Commission operates and serves as the City's contracting partner for SFO. .................................................8

    C.    The Board of Supervisors enacts the HAO, legislation drafted by airport-worker unions to impose healthcare-benefits requirements on airlines operating at SFO....................9

        1.    Labor unions representing airport workers draft and lobby for legislation requiring no-cost health insurance. ..............................................................................9

        2.    The Board of Supervisors enacts the HAO, requiring airlines and airline service providers, but not the City, to provide free "platinum-level" healthcare benefits to employees and their families or else pay a penalty. .............................................................10

# TABLE OF CONTENTS
## (continued)

Page

3. The HAO contains union-written "findings." ..................13

4. The HAO applies independently of any contract and is backed by criminal and civil penalties....................14

D. The Board of Supervisors amends the HAO, clarifying that the HAO is designed "only to promote the general welfare." ..............................................................................15

E. The airlines and Commission enter into lease extensions reserving the airlines' rights to challenge the HAO....................16

F. A4A challenges the HAO, and the district court holds that federal law cannot preempt the HAO because the HAO does not have the force of law.........................................................17

1. A4A sues, explaining that the HAO is preempted by three federal statutes and that it violates the Contracts Clauses of the U.S. and California Constitutions...........................................................17

2. The district court holds that the HAO is merely "market participation," not regulation. ..............................18

STANDARD OF REVIEW .................................................................22

SUMMARY OF ARGUMENT .............................................................22

ARGUMENT......................................................................................28

A. The government acts as a regulator when it threatens criminal or civil sanctions or otherwise acts as only a government can. ...............................................................28

1. State or local government action has the force of law when it is backed by criminal penalties.............................30

## TABLE OF CONTENTS
### (continued)

                                                                           **Page**

2.     Government action also has the force of law when it is backed by civil penalties. ...................................................33

3.     The government also acts as a regulator when it otherwise uses governmental tools or proceeds in a way that a private actor could not or would not. ............36

B.     The HAO has the force of law because it is backed by criminal penalties. ..............................................................39

    1.     Under unambiguous California law, the HAO threatens criminal penalties..................................................39

    2.     The district court's reasoning is wrong. ............................40

C.     The HAO has the force and effect of law because it is backed by civil penalties. ..................................................48

    1.     The HAO is backed by civil penalties.................................49

    2.     The district court's analysis was wrong. ............................53

D.     Criminal and civil penalties aside, the HAO has the force and effect of law because it is uniquely governmental. .............58

    1.     The City fails prong 1 of the *LAX* test because it used tools available only to the government and did not pursue a proprietary interest in enacting the HAO. .......................................................................59

    2.     The City fails prong 2 of the *LAX* test because the HAO is not tailored to a proprietary purpose...................63

    3.     The *LAX* test is flawed, as the Solicitor General has explained, and the HAO also has the force and effect of law under the correct test. .....................................66

# TABLE OF CONTENTS
(continued)

**Page**

CONCLUSION ....................................................................68

CERTIFICATE OF COMPLIANCE ....................................69

CERTIFICATE OF SERVICE .............................................70

INDEX OF ADDENDUM ...................................................72

ADDENDUM........................................................................73

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Air Evac EMS, Inc. v. Cheatham,*
910 F.3d 751 (4th Cir. 2018) ................................................................................58

*Airline Service Providers Association v.*
*Los Angeles World Airports,*
873 F.3d 1074 (9th Cir. 2017) ................................................ 4, 5, 21, 24, 26, 27,
...................................................... 36, 37, 38, 39, 58, 59, 60, 63, 64, 66

*American Airlines, Inc. v. Wolens,*
513 U.S. 219 (1995) .......................................................... 23, 29, 31, 37, 50

*American Trucking Associations, Inc. v. City of Los Angeles,*
569 U.S. 641 (2013) ...................................................... 3, 22, 23, 28, 29,
...................................................... 30, 31, 32, 33, 34, 35, 37, 40, 58, 67

*Antilles Cement Corp. v. Fortuño,*
670 F.3d 310 (1st Cir. 2012) ................................................................................37

*Badie v. Bank of America,*
67 Cal. App. 4th 779 (1998) ................................................................................56

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020) ................................................................................41

*Building & Construction Trades Council of Metropolitan District v.*
*Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.,*
507 U.S. 218 (1993) ...................................................................... 64, 65

*California Association of Psychology Providers v. Rank,*
51 Cal. 3d 1 (1990) ................................................................................43

*California Building Industry Association v.*
*State Water Resources Control Board,*
4 Cal. 5th 1032 (2018) ................................................................................45

*California Federal Savings & Loan Association v. City of Los Angeles,*
902 P.2d 297 (Cal. 1995) ................................................................................41

*Chamber of Commerce of the United States v. Bragdon,*
64 F.3d 497 (9th Cir. 1995) ................................................................................62

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Chamber of Commerce of the United States v. Brown,*
554 U.S. 60 (2008) .................................................................... 35, 61, 62, 63, 64

*Chamber of Commerce of the United States v. Lockyer,*
463 F.3d 1076 (9th Cir. 2006) (en banc), *rev'd sub nom.*
*Chamber of Commerce of United States v. Brown,*
554 U.S. 60 (2008) ................................................................................................35

*Chodos v. West Publishing Co.,*
292 F.3d 992 (9th Cir. 2002) ........................................................................ 50, 51

*County of Fresno v. Clovis Unified School District,*
204 Cal. App. 3d 417 (1988) ............................................................................41

*County of San Diego v. State,*
931 P.2d 312 (1997) ...........................................................................................43

*Engine Manufacturers Association v.*
*South Coast Air Quality Management District,*
498 F.3d 1031 (9th Cir. 2007) ...................................................................... 34, 35

*First Resort, Inc. v. Herrera,*
860 F.3d 1263 (9th Cir. 2017) .........................................................................45

*Friends of the Eel River v.*
*North Coast Railroad Authority,*
399 P.3d 37 (Cal. 2017) ........................................................... 29, 33, 34, 35, 57

*Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.,*
232 Cal. App. 4th 1332 (2015) .........................................................................52

*Great Western Shows, Inc. v. County of Los Angeles,*
44 P.3d 120 (Cal. 2002) ............................................................................... 41, 42

*GSW, Inc. v. Long County,*
999 F.2d 1508 (11th Cir. 1993) ................................................... 37, 59, 60, 65

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Hydrostorage, Inc. v. Northern California Boilermakers*
*Local Joint Apprenticeship Committee*,
891 F.2d 719 (9th Cir. 1989),
*abrogated on other grounds as stated in*
*Engine Manufacturers Association v.*
*South Coast Air Quality Management District*,
498 F.3d 1031 (9th Cir. 2007) ................................................................ 34, 35, 52

*International Association of Machinists & Aerospace Workers v.*
*Wisconsin Employment Relations Commission*,
427 U.S. 132 (1976) ....................................................................................... 17

*Johnson v. Rancho Santiago Community College District*,
623 F.3d 1011 (9th Cir. 2010) .................................................... 29, 36, 58

*Jones v. Lodge at Torrey Pines Partnership*,
177 P.3d 232 (Cal. 2008) ............................................................................ 44

*Krobitzsch v. Middleton*,
72 Cal. App. 2d 804 (1946) ........................................................................ 56

*Metropolitan Milwaukee Association of Commerce v.*
*Milwaukee County*,
431 F.3d 277 (7th Cir. 2005) ..................................................... 63, 65, 66

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ...................................................................................... 18

*Northwest, Inc. v. Ginsberg*,
572 U.S. 273 (2014) .................................................... 23, 29, 37, 50, 59

*Olympic Pipe Line Co. v. City of Seattle*,
437 F.3d 872 (9th Cir. 2006) ....................................... 22, 37, 38, 61

*People v. Garth*,
234 Cal. App. 3d 1797 (1991) .................................................................. 41

*People v. Giordano*,
170 P.3d 623 (Cal. 2007) ........................................................................... 48

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*People v. Gjersvold*,
230 Cal. App. 4th 746 (2014) ............................................................43

*People v. Leal*,
94 P.3d 1071 (Cal. 2004) ........................................................... 47, 48

*People v. Miller*,
23 Cal. App. 5th 973 (2018) ..............................................................43

*People v. Minor*,
96 Cal. App. 4th 29 (2002) ............................................ 42, 45, 46, 47

*Prime Gas, Inc. v. City of Sacramento*,
184 Cal. App. 4th 697 (2010) ...........................................................45

*Ridgley v. Topa Thrift & Loan Association*,
953 P.2d 484 (Cal. 1998) ..................................................................51

*Rotkiske v. Klemm*,
140 S. Ct. 355 (2019).................................................... 41, 43, 44, 45

*Rowe v. New Hampshire Motor Transport Association*,
552 U.S. 364 (2008)...........................................................................33

*Sahab v. Baca*,
No. 11-7061, 2014 WL 102410 (C.D. Cal. Jan. 8, 2014).................... 42, 46, 47

*SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*,
137 S. Ct. 954 (2017).........................................................................45

*Selevan v. New York Thruway Authority*,
584 F.3d 82 (2d Cir. 2009) ...............................................................67

*South-Central Timber Development, Inc. v. Wunnicke*,
467 U.S. 82 (1984).............................................................. 29, 30, 64

*Tabares v. City of Huntington Beach*,
988 F.3d 1119 (9th Cir. 2021) ..........................................................22

*Tri-M Group, LLC v. Sharp*,
638 F.3d 406 (3d Cir. 2011) ................................ 29, 33, 34, 52, 61, 65

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United Haulers Association v.*
  *Oneida-Herkimer Solid Waste Management Authority,*
  438 F.3d 150 (2d Cir. 2006) .................................................................34

*United Healthcare Insurance Co. v. Davis,*
  602 F.3d 618 (5th Cir. 2010) ...............................................................65

*United States v. Pepe,*
  895 F.3d 679 (9th Cir. 2018) ...............................................................45

*Verizon Maryland Inc. v. Public Service Commission,*
  535 U.S. 635 (2002) .........................................................................5, 6

*Wisconsin Department of Industry,*
  *Labor & Human Relations v. Gould Inc.,*
  475 U.S. 282 (1986) ....................................................................... 64, 65

## CONSTITUTIONS AND STATUTES

U.S. Const. art. I, § 10, cl. 1 ............................................................5, 18

U.S. Const. art. VI, cl. 2 .......................................................................5

Cal. Const. art. I, § 9 .........................................................................18

28 U.S.C. § 1291..................................................................................6

28 U.S.C. § 1331..................................................................................5

28 U.S.C. § 1367(a) ..............................................................................5

29 U.S.C. § 206(a)(1)(C).......................................................................12

Employee Retirement Income Security Act of 1974 (ERISA),
  29 U.S.C. § 1144...........................................................................2, 5
  29 U.S.C. § 1144(a) .......................................................... 2, 17, 22, 28
  29 U.S.C. § 1144(c) ..........................................................................2

Railway Labor Act (RLA),
  45 U.S.C. § 151 *et seq.*.....................................................................5

Airline Deregulation Act (ADA),
  49 U.S.C. § 41713..........................................................................2, 5

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

49 U.S.C. § 41713(b) ........................................................................ 18, 22, 28

49 U.S.C. § 41713(b)(1) ................................................................................2

Cal. Gov't Code § 25132(a) ................................................ 3, 7, 14, 19, 20, 24, 25,
.................................................................... 39, 40, 41, 42, 44, 45, 47, 67

Cal. Gov't Code § 25132(b)(1)-(3) .................................................................7

Cal. Gov't Code § 36900(a) .......................................... 3, 7, 14, 19, 20, 24, 25, 39,
.................................................................... 40, 41, 42, 44, 45, 46, 47, 67

Cal. Gov't Code § 36900(b)(1)-(3) .................................................................7

Cal. Penal Code § 16 .....................................................................................14

Cal. Penal Code § 19 .......................................................................... 7, 14, 15, 39, 40

Cal. Penal Code § 19.6 ....................................................................................7

L.A. Mun. Code § 11.00(m) ..........................................................................46

S.F. Admin. Code § 12Q.2.9 .........................................................................12

S.F. Admin. Code § 12Q.2.16 ................................................................. 12, 13

S.F. Admin. Code § 12Q.5(f) .........................................................................15

S.F. Admin. Code § 12Q.5.1 ..........................................................................51

S.F. Admin. Code § 12Q.5.1(4) .....................................................................15

S.F. Admin. Code § 12Q.5.2 ..........................................................................57

S.F. Admin. Code § 14.1(b)(4) ............................................................... 12, 13

S.F. Admin. Code § 14.2 ................................................................................12

S.F. Admin. Code § 14.2(g) ...........................................................................12

S.F. Admin. Code § 28.11 ..............................................................................51

S.F. Charter § 2.105 .........................................................................................7

S.F. Charter § 4.115 .........................................................................................8

S.F. Charter art. II ............................................................................................7

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**RULES**

Fed. R. App. P. 4(a) ...............................................................................6

**OTHER AUTHORITIES**

2003 Cal. Legis. Digest Ch. 60 (S.B. 567),
    https://tinyurl.com/yu7djzph.........................................................44

2017 Cal. Legis. Digest Ch. 405 (A.B. 556),
    https://tinyurl.com/25utfte8..........................................................44

2018 Cal. Legis. Digest Ch. 970 (A.B. 2598),
    https://tinyurl.com/2p8bd6fm......................................................44

2021 Cal. Legis. Digest Ch. 207 (S.B. 60),
    https://tinyurl.com/2n3x5rfr.........................................................44

*Black's Law Dictionary* (11th ed. 2019) ................................................7

*Honorable James B. Lindholm, Jr.*,
    63 Ops. Cal. Att'y Gen. 418, 1980 WL 96857 (1980).....................42

*Honorable James F. Penman*,
    94 Ops. Cal. Att'y Gen. 39, 2011 WL 6753986 (2011)...................42

*Honorable Michael R. Capizzi*,
    74 Ops. Cal. Att'y. Gen. 211, 1991 WL 495486 (1991)..................42

*Honorable Ronald L. MacMillen*,
    60 Ops. Cal. Att'y Gen. 83, 1977 WL 24859 (1977).............. 19, 20, 40, 42, 43

# GLOSSARY

| | |
|---|---|
| A4A | Airlines for America |
| ADA | Airline Deregulation Act |
| Board of Supervisors | The City's legislative branch |
| City | City and County of San Francisco |
| City Option | Requirement that airlines or airline service providers pay $9.50 per hour per employee if they do not provide free healthcare benefits complying with the HAO |
| ERISA | Employee Retirement Income Security Act |
| HAO | Healthy Airport Ordinance, 2-ER-58-74, 2-ER-134-41 |
| HAP | Health Access Program |
| HCAO | Health Care Accountability Ordinance |
| LUAs | The ten-year 2011 Lease and Use Agreements between airlines and the City for airline operations at SFO, and extended as modified |
| Platinum or platinum-level | Type of healthcare benefits plan that the HAO requires airlines and airline service providers to offer free of charge to their employees |
| QSP | Quality Standards Program, 4-ER-429-510 |
| RLA | Railway Labor Act |
| SFO | San Francisco International Airport |

**REQUEST FOR ORAL ARGUMENT**

This appeal presents an important legal issue that A4A believes the district court incorrectly resolved. A4A believes that oral argument would help the Court decide this case.

## INTRODUCTION

Private businesses generally cannot tell other businesses what to do, unless the parties have agreed otherwise in a contract. So, for example, a landlord cannot tell a lessee what healthcare benefits to provide its employees, unless the parties sign a lease giving the landlord that right. Nor can private businesses enforce their demands with misdemeanor prosecutions. Similarly, private businesses cannot impose discretionary fines on contracting partners for refusing to comply with terms their counterparties never agreed to in the contract.

The City and County of San Francisco knows all that. That is why, when it wanted airlines and airline service providers at San Francisco International Airport (SFO) to start providing free premium healthcare plans for their employees, it cut SFO's management out of the picture and did what only a government can do. In November 2021, the City enacted legislation imposing its demands: the Healthy Airport Ordinance (HAO).

The HAO requires all airlines and airline service providers at SFO to pay for "platinum-level" healthcare benefits for their employees and their employees' families. The alternative is to pay $9.50 per employee per hour—more than the federal minimum wage—into a City fund that the HAO does

not let the employee access. The HAO purports to bind airlines even if the airlines (like Airlines for America's (A4A) members) have not agreed to the HAO in their leases for SFO with the City. Indeed, the HAO provides that airlines cannot waive its requirements in their collective-bargaining agreements (CBAs) with their employees. The consequences for noncompliance are harsh. Violations are misdemeanors, and they also trigger civil penalties, including fines of $1,000 per employee per day—or more—at the Airport Director's discretion.

This appeal concerns the City's claim that the HAO does not have the force and effect of law—or, put another way, that it is not regulatory. According to the City, the HAO cannot be preempted by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1144(a), (c); the Airline Deregulation Act, 49 U.S.C. § 41713(b)(1); or the Railway Labor Act (RLA) because the City was not legislating but only participating in the market in the same way a private business might. The district court agreed, entering judgment for the City without reaching preemption on the merits.

That is wrong. The HAO imposes coercive criminal and civil penalties available only to governments. The HAO is regulation.

1.     Because federal preemption reaches only regulation, a government can avoid preemption if it "acted as a private party, contracting in a way that the owner of an ordinary commercial enterprise could mimic." *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 569 U.S. 641, 651 (2013) (*ATA*). But when a government uses "a coercive mechanism, available to no private party, it acts with the force and effect of law, whether or not it does so to turn a profit," and cannot invoke the market-participation exception. *ATA*, 569 U.S. at 651-52. Thus, a government's demands are regulatory when it threatens criminal penalties, or fines or penalties unavailable to ordinary contracting parties.

2.     The HAO imposes criminal penalties. Under California law, "[v]iolation of a city" or county "ordinance is a misdemeanor unless by ordinance it is made an infraction." Cal. Gov't Code § 25132(a) (county); *id.* § 36900(a) (city). The HAO does not make violations infractions, so §§ 25132(a) and 36900(a)'s plain language makes them misdemeanors. So the inquiry ends there: the City cannot invoke the market-participation defense, because only the government can wield "the hammer of the criminal law." *ATA*, 569 U.S. at 651. But the district court refused to give §§ 25132(a) and 36900(a) their plain meaning, rejecting California caselaw and instead

- 3 -

relying on a purposive and since-abandoned 1977 California Attorney General opinion reasoning that the statutes cannot mean what they say. That was error.

**3.**    The HAO is also regulatory because it is backed by civil penalties. For example, the HAO requires noncompliant airlines to pay $9.50 per hour into a City fund and allows the government to assess fines of $1,000 per day or more, *at the Airport Director's discretion*. Those consequences are civil penalties for two reasons. *First*, the airlines never agreed to them—they apply only by force of law. Ordinary businesses cannot demand money from their contractual partners for failure to meet extracontractual demands. *Second*, the HAO's consequences are unlike any contractual remedy available to private parties. Although private businesses may provide by contract for fixed and certain liquidated damages, for instance, they cannot enforce discretionary fines. In concluding otherwise, the district court failed to grapple with the airlines' express reservation of their right to challenge the HAO and the uniquely governmental nature of the HAO's consequences.

**4.**    Finally, although the HAO's criminal and civil penalties foreclose the City's market-participation defense, the HAO is also regulatory because it fails the test under *Airline Service Providers Association v. Los*

*Angeles World Airports*, 873 F.3d 1074, 1080 (9th Cir. 2017) (*LAX*). *First*, the City used an ordinance—a tool available only to the government—to impose requirements the airlines never agreed to. And it did so to promote the general welfare, not simply to manage SFO like a private business. *Second*, the HAO is not tailored to any proprietary purpose—instead, it singles out airlines and airline service providers even though other airport-based businesses have extensive public contact, all while imposing spillover costs on airline employees nationwide. The HAO was coercive regulatory action, not a business judgment. Indeed, the Airport itself *opposed* the HAO.

No private party can enforce its demands with criminal penalties or discretionary fines. Because the HAO purports to do just that, the City cannot hide behind the market-participation defense to avoid preemption. The Court should reverse and remand for further proceedings.

## JURISDICTIONAL STATEMENT

**a.** The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). This case arises under (i) the Supremacy and Contracts Clauses of the U.S. Constitution, U.S. Const. art. VI, cl. 2, and art. I, § 10, cl. 1; and (ii) federal law, including ERISA, 29 U.S.C. § 1144; the ADA, 49 U.S.C. § 41713; and the RLA, 45 U.S.C. § 151 *et seq. See Verizon Md. Inc. v. Public Serv. Comm'n,*

535 U.S. 635, 642 (2002). The district court had supplemental jurisdiction over A4A's claim under the California Constitution because that claim is part of the same controversy as A4A's federal-law claims.

**b.** This Court has jurisdiction under 28 U.S.C. § 1291 because this appeal is from a final judgment that disposes of all parties' claims.

**c.** This appeal is timely. On April 5, 2022, the district court granted summary judgment for the City and entered final judgment. On May 3, 2022, within thirty days, A4A filed its notice of appeal. 4-ER-558-60; *see* Fed. R. App. P. 4(a).

## STATEMENT OF ISSUES

Whether the City and County of San Francisco's Healthy Airport Ordinance has the force and effect of law, meaning that the City cannot invoke the market-participation defense to preemption by federal law.

## PERTINENT STATUTORY PROVISIONS

Relevant authorities are reproduced in the addendum (at 72-97).

## STATEMENT OF THE CASE

### A. The Board of Supervisors is San Francisco's legislative branch.

San Francisco is a chartered city and county under the California Constitution. 4-ER-532. Under the City's Charter, the Board of Supervisors is the

City's legislative branch, and "[a]ll legislative acts shall be by ordinance." S.F. Charter § 2.105; *see id.* art. II.

California law provides that "[v]iolation of a city" or a county "ordinance is a misdemeanor unless by ordinance it is made an infraction." Cal. Gov't Code § 36900(a) (city); *id.* § 25132(a) (county). Thus, an ordinance violation "may be prosecuted" by city or county "authorities in the name of the people of the State of California, or redressed by civil action." *Id.*

A misdemeanor is a crime. *See* "Misdemeanor," *Black's Law Dictionary* (11th ed. 2019). Absent a more specific provision, California law makes a misdemeanor "punishable by imprisonment in the county jail not exceeding six months, or by fine not exceeding one thousand dollars ($1,000), or by both." Cal. Penal Code § 19. "An infraction," in contrast, "is not punishable by imprisonment" and carries no right "to a trial by jury" or appointed counsel. *Id.* § 19.6. A violation of a city or county ordinance is punishable by a fine of up to $100 for the first violation, $200 for a second violation within a year of the first, and $500 "for each additional violation of the same ordinance within one year of the first violation." Cal. Gov't Code §§ 25132(b)(1)-(3), 36900(b)(1)-(3).

**B.    The Airport Commission operates and serves as the City's contracting partner for SFO.**

Like every other international airport in the United States, SFO is publicly owned and provides federally regulated transportation services. 2-ER-166, 4-ER-532. San Francisco owns the airport and operates it through the City's Airport Commission. The airport has its own dedicated San Francisco Police Department Airport Bureau and San Francisco Fire Department Airport Division. 2-ER-172-73. And the City can use (and has used) eminent domain to secure property for SFO. 2-ER-166, 2-ER-174.

The Airport Commission is responsible for "the construction, management, supervision, maintenance, extension, operation, use and control of all property, as well as the real, personal and financial assets which are under the Commission's jurisdiction." S.F. Charter § 4.115. The Commission contracts on the City's behalf with companies that provide services at SFO, including airlines that lease airport and terminal space. 4-ER-538-39. But the Commission has "no authority" to legislate. 2-ER-107.

In 2010, the Commission entered into two dozen lease agreements with different airlines, each for a ten-year term starting in 2011. 4-ER-539. The agreements set out SFO's and the airlines' rights and obligations, including

the requirements with which the airlines agree to comply as a condition of operating at SFO. 3-ER-224-411.

### C. The Board of Supervisors enacts the HAO, legislation drafted by airport-worker unions to impose healthcare-benefits requirements on airlines operating at SFO.

#### 1. Labor unions representing airport workers draft and lobby for legislation requiring no-cost health insurance.

In July 2020, San Francisco labor leader Mike Casey and several labor unions representing airport workers lobbied the Board of Supervisors for legislation that would require SFO employers to provide free health insurance for workers and their families. That summer, the unions worked with Supervisor Rafael Mandelman's staff and the City Attorney's office to draft the HAO. The unions told the City Attorney that their "primary goal" was requiring airport employers to provide free healthcare to "all workers" who are union members. 2-ER-124. Casey connected Supervisor Mandelman's legislative aide with a labor union "researcher" who would "work[] with" the Supervisor's staff on "the findings section of the legislation." 2-ER-121.

In September 2020, Supervisor Mandelman introduced the HAO, which was designed "to apply to airlines and their service providers at SFO" but have a "minimal impact" on the airport itself. 2-ER-89. Neither the

Commission nor the Airport had helped write the legislation. Because the HAO was "a legislative amendment led by the [Board of Supervisors]," as one Airport Director put it, the Commission had "no authority" to enact it, 2-ER-107, and played "no role" in developing it, 2-ER-89.

The Commission opposed the ordinance. The Airport Director believed it was "not the right time" for the legislation because it would impose many new costs on airport employers during the COVID-19 pandemic. 2-ER-99. In a letter to the Board of Supervisors' Budget and Finance Committee, he underscored that the HAO would lead to an "increased cost of doing business at SFO"—about $120 million annually—and could "slow SFO's post-pandemic recovery relative to that of other airports." 2-ER-57.

> **2.  The Board of Supervisors enacts the HAO, requiring airlines and airline service providers, but not the City, to provide free "platinum-level" healthcare benefits to employees and their families or else pay a penalty.**

In November 2020, the Board of Supervisors enacted the HAO, which went into effect in March 2021. The ordinance requires certain SFO employers—airlines and airline service providers, but not the City (which employs certain SFO staff, plus SFO's firefighters and police officers) or concessionaries or other businesses at the airport—to do one of two things. Employers

must either (a) provide no-cost "platinum-level" healthcare benefits for their employees and their employees' families or (b) pay a $9.50-per-employee-per-hour penalty into a City fund—the so-called "City Option." 2-ER-136.

      **a.    The "platinum-level" healthcare option.** The HAO requires airlines and airline service providers to:

- offer a least one "platinum-level" healthcare plan, meaning a plan covering benefits actuarially equivalent to at least 90% of the full actuarial value of the benefits provided;

- cover all services described in the California Essential Health Benefit Benchmark Plan, including services like acupuncture and children's orthodontia;

- offer those plans to all covered employees, no matter how few hours the employee works per week;

- extend those plans to cover each employee's spouse and dependents; and

- absorb 100% of the plans' costs, with no cost-sharing with employees.

2-ER-68, 74. Before it was amended several months later, as discussed below (at 15-16), the HAO's platinum-level option also required employers to eliminate existing, collectively-bargained-for healthcare plans that did not meet these strict requirements, even if employees wanted to keep their existing plans. *See* 2-ER-68 (employer "may offer additional health benefit plans, provided that each such health benefit plan" meets requirements).

**b.** **The City Option.** Employers that do not comply with the HAO's healthcare requirements must pay $9.50 per employee per hour—more than the federal minimum wage of $7.25, *see* 29 U.S.C. § 206(a)(1)(C)—into a Health Access Program (HAP) account established under § 14.2 of the San Francisco Administrative Code. 2-ER-69. Although the HAO calls the payments "contributions for" each "employee," *id.*, the law does not authorize the HAP to make employers' payments available to employees or their families, as the City concedes. *See* Dist. Ct. Doc. No. 41, at 18-19; Dist. Ct. Doc. No. 47, at 18.

To explain: Under San Francisco Administrative Code § 14.2(g), the Department of Public Health may "maintain Medical Reimbursement Accounts from which eligible Covered Employees may obtain reimbursement of Health Care Expenditures." But the Covered Employees do "not include those persons who are 'Covered Employees' as defined in Section 12Q.2.9 of the Health Care Accountability Ordinance" (HCAO) "if the Employer meets the requirements set forth in Section 12Q.3"—*i.e.*, the HAO. S.F. Admin. Code § 14.1(b)(4). Section 12Q.2.9, as amended by the HAO, defines a "Covered Employee" as any "San Francisco Airport Service Employee," 2-ER-66, meaning any airport-based employee covered by the Quality Standards

Program (QSP). S.F. Admin. Code § 12Q.2.16. The QSP applies to airline and airline service provider employees whose work affects safety or security at SFO, and it sets general standards for safety, health, hiring practices, training, equipment, and compensation benefits. 1-ER-4-5, 4-ER-424-39. Because paying the City Option penalty "meets the requirements set forth in [the HAO]," S.F. Admin. Code § 14.1(b)(4), "Covered Employees" do not include airline employees and the law does not authorize airline employees to access money from HAP accounts.

### 3. The HAO contains union-written "findings."

The HAO contains several "findings" written by union lawyers. For instance, the HAO states that "[e]mployees working at the Airport who perform services that directly impact safety and/or security at the Airport are at considerable risk of contracting and spreading COVID-19 due to the nature of their work duties." 2-ER-64. But the HAO contains no requirements targeting the spread of COVID-19, such as mask-wearing, social-distancing, or vaccine mandates. Nor does it apply to the San Francisco police officers or firefighters who work at the airport, even though they "perform services that directly impact safety and/or security at the Airport and are at considerable risk of contracting and spreading COVID-19." *Id.*; *see* 2-ER-172-73.

And the City does not otherwise provide those officers or firefighters with the free health insurance the HAO requires airlines to provide. 2-ER-157, 2-ER-165. The HAO also does not apply to many SFO employees with regular passenger contact, like concessionaires. 2-ER-146.

> **4.    The HAO applies independently of any contract and is backed by criminal and civil penalties.**

The HAO applies no matter the terms in the City's agreements with an airline or airline service provider, and its demands are backed by criminal and civil sanctions.

**a.    The HAO is an unnegotiated and unnegotiable legislative command.** The HAO is like any other law: its requirements and penalties for noncompliance apply to all airlines and service providers operating at SFO, no matter the terms of the airlines' or service providers' leases with the Commission or the airlines' CBAs or contracts with their employees. *See* 2-ER-60-74, 2-ER-136-41. In fact, the HAO prohibits waiving its requirements by CBA, so employers and employees cannot contract around it. 2-ER-72.

**b.    Criminal penalties.** Under California law, "[v]iolation of" a city or county "ordinance is a misdemeanor unless by ordinance it is made an infraction." Cal. Gov't Code §§ 25132(a), 36900(a); *see* Cal. Penal Code §§ 16,

19; *supra* pp. 6-7. The HAO is a city and county ordinance, and it does not make violations infractions.

**c.    Civil penalties.** Violating the HAO also triggers civil penalties. Among other things, the City may:

- charge a violator for missed City Option payments, plus interest;

- assess penalties of $100 per week per employee;

- cancel any contract with the employer and bar the employer from entering into any contracts with the City for three years;

- bring a civil action against the employer, with the prevailing party entitled to costs and expenses.

S.F. Admin. Code §§ 12Q.5(f), 12Q.5.1(4). And under the QSP, the City may demand fines of $1,000 per employee per day, or an even higher amount "at the discretion of the Airport Director." 4-ER-505.

**D.    The Board of Supervisors amends the HAO, clarifying that the HAO is designed "only to promote the general welfare."**

After the City enacted the HAO, "employees ha[d] to change health plans" because the ordinance did not allow airlines to offer non-platinum plans, even if workers wanted to keep those plans. 2-ER-104; *see supra* pp. 10-11. So the unions began "working w/ Supervisor Mandelman on some amendments to the HAO." 2-ER-104.

The Board of Supervisors passed the union-generated amendments in April 2021. *See* 2-ER-80; 2-ER-141. The amendments allow employers to offer additional—though still highly restrictive—healthcare plans, called "gold-level" offerings, so long as they provide at least one platinum-level option. *See* 2-ER-136-37.

The amendments make the HAO's purpose clear. Section 5 states that "[i]n undertaking the adoption and enforcement of this ordinance, the City is undertaking *only* to promote the general welfare." 2-ER-140 (emphasis added).

### E. The airlines and Commission enter into lease extensions reserving the airlines' rights to challenge the HAO.

Meanwhile, the airlines were negotiating lease extensions with the Commission. Given the complications caused by the COVID-19 pandemic, the parties chose not to enter new 10-year lease agreements. Instead, they agreed to "modifications" of their 2011 Lease and Use Agreements (LUAs) extending those agreements for two more years. *See* 2-ER-93. In the 2011 LUAs, the airlines had agreed to comply with the QSP and the HCAO. 1-ER-5. But although they generally continued the LUAs' terms, the extensions

underscored that the airlines did *not* agree to comply with the HAO. Instead, the modifications reserved the airlines' right to challenge the ordinance:

> Neither the execution of this Modification by Airline or City, nor the performance by either party under the Existing [lease] or this Modification, shall in any way prejudice or constitute a waiver of: (a) Airline's right to challenge the [HAO] or the validity or enforcement thereof, or (b) the rights of either party to fully prosecute or defend, as applicable, any lawsuit by the Airline against the City challenging the [HAO].

3-ER-221.

### F. A4A challenges the HAO, and the district court holds that federal law cannot preempt the HAO because the HAO does not have the force of law.

#### 1. A4A sues, explaining that the HAO is preempted by three federal statutes and that it violates the Contracts Clauses of the U.S. and California Constitutions.

A4A sought relief in federal court, explaining that three federal statutes preempt the HAO. *First*, ERISA preempts state and local laws that "relate to any employee benefit plan." 29 U.S.C. § 1144(a). The HAO requires airlines to adopt platinum-level benefits plans or pay exorbitant penalties to retain existing plans. *Second*, the RLA preempts state and local laws that "attempt[] to influence the substantive terms of collective-bargaining agreements." *International Ass'n of Machinists & Aerospace Workers v. Wisconsin Emp. Rels. Comm'n*, 427 U.S. 132, 153 (1976). The HAO does not just

- 17 -

"influence" airlines CBAs. It rewrites them. *Third*, the ADA preempts any state or local "law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b). The HAO will have a "forbidden significant effect," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 388 (1992), by forcing airlines to increase prices and eliminate routes and services. *See* 4-ER-549-50.

A4A also explained that the HAO violates the Contracts Clauses of the U.S. and California Constitutions by "impair[ing] the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1; *see* Cal. Const. art. I, § 9. It disrupts airlines' CBAs with their employees, forcing the airlines to spend more money to secure what they bargained for. *See* 4-ER-555-56.

### 2. The district court holds that the HAO is merely "market participation," not regulation.

The City's threshold defense was that the HAO cannot be preempted because it is market participation, not regulation. The parties agreed to litigate the market-participation issue first, with A4A agreeing to relinquish its Contracts Clause claims if the courts ultimately determine that the HAO is market participation. Dist. Ct. Doc. No. 34, at 4-5.

On cross-motions for summary judgment, Dist. Ct. Doc. Nos. 41, 42, the district court ruled for the City, holding that the HAO is market participation rather than regulation.

**Criminal penalties.** The district court first noted that "[t]here is no dispute that the threat of criminal penalties is a unique governmental function and would make the City a regulator, not a market participant, when enacting the HAO." 1-ER-10. In the court's view, however, the HAO is not backed by criminal penalties because "neither the HAO nor any related ordinance provides that violations can lead to criminal enforcement." 1-ER-11.

The court acknowledged that California law states that "[v]iolation of a county ordinance is a misdemeanor unless by ordinance it is made an infraction," *id.* (quoting Cal. Gov't Code § 25132(a)), and that another section "provides the same but for violations of city ordinances, *id.* (citing Cal. Gov't Code § 36900(a)). But honoring the statutes' plain language "would produce absurd results," the court reasoned, because it would "'mean that every conceivable violation of any ordinance constitutes a misdemeanor.'" 1-ER-11-12 (quoting *Honorable Ronald L. MacMillen*, 60 Ops. Cal. Att'y Gen. 83, 1977 WL 24859, at *4 (1977)). (The court did not address the "unless by ordinance it is made an infraction" language, or the statutes' statement that violations may

also be "redressed by civil action." Cal. Gov't Code §§ 25132(a), 36900(a).) Relying on the California Attorney General's 1977 *MacMillen* opinion, the court reasoned that the California legislature could have amended the statute if it disagreed with the Attorney General. 1-ER-12.

**Civil penalties.** The district court next held that the HAO does not contain civil penalties. The court acknowledged that government action is regulatory if it uses civil enforcement mechanisms unavailable to private parties. *See* 1-ER-17-18. It nonetheless held, without meaningfully grappling with the lease extensions' reservation of rights, that "the airlines voluntarily agreed to [the HAO's] term[s]." 1-ER-22. The court also equated the HAO's consequences for noncompliance with "ordinary contract remedies." 1-ER-19. For example, the court reasoned that the HAO's provisions allowing the City to seek $100 per week and $1,000 or more per employee per day, at the Airport Director's discretion, are "functionally equivalent to ordinary commercial contract terms wherein contract parties may agree to certain consequences for breach." 1-ER-18. In the court's view, those provisions represented a "reasonable estimate of the harm that would be caused by violations" of the HAO even though they were directly borrowed from the HCAO, older legislation that merely requires employers to offer certain

minimum health insurance coverage, 1-ER-4. 1-ER-21-22. The court also reasoned that the City Option is not a penalty because airline employees "can access the money" paid into the HAP, even though, the court acknowledged, a plain reading of the HAO and San Francisco Administrative Code does not authorize that access. 1-ER-19-21.

The *LAX* test. Finally, the district court held that the HAO was market participation under the *LAX* test. Under the first inquiry, the court reasoned that the City enacted the HAO to pursue the efficient procurement of goods and services, as a similarly situated private business might. The court reasoned that the lease agreements "include a provision where the contracting airlines agrees [sic] to comply with the HCAO and its future amendments, *e.g.*, the HAO." 1-ER-29. According to the court, because the airlines "were aware of the HAO and the [lease agreement] provision that requires them to comply with the HAO" when they signed the lease extensions, the HAO "applied as a result of an agreement," not because of the force of law. 1-ER-30. The court also reasoned that the City enacted the HAO to advance airport safety and security by helping recruit high-quality employees and prevent their turnover. *See* 1-ER-31.

- 21 -

On the second inquiry, the court held that the HAO's narrow scope showed that it was market participation. 1-ER-34. The court reasoned, without evidence, that the HAO applies only to airport employers and that it will reduce turnover, thus enhancing safety and security at the airport. 1-ER-36.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's decision regarding preemption," *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 877 n.12 (9th Cir. 2006), as well a "district court's order granting summary judgment and its interpretation of state law," *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1124 (9th Cir. 2021) (citation omitted).

## SUMMARY OF ARGUMENT

The HAO has the force of law, and so is subject to federal preemption. The HAO imposes requirements by fiat, not agreement, and backs them with civil and criminal penalties available only to the government.

**A.** Preemption under the ADA, ERISA, and the RLA reaches state and local government action that has "the force and effect of law." *ATA*, 569 U.S. at 649-50; *see* 49 U.S.C. § 41713(b); 29 U.S.C. § 1144(a). Such "quintessential regulatory action" includes "'government-imposed policies' prescribing 'binding standards of conduct,'" *ATA*, 569 U.S. at 649 (citation omitted),

"that operate irrespective of any private agreement," *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 229 n.5 (1995) (citations omitted); *see Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 285-87 (2014). Only when the government enters "into a contract" or otherwise behaves "just as a private party would" can it escape preemption as a so-called market participant. *ATA*, 569 U.S. at 649-50. Three sets of considerations inform the market-participation inquiry.

**1.** Government action has the force of law where it is backed by criminal penalties. *Id.* As *ATA* makes clear, that is the rule *even if* private parties agree to abide by the requirements backed by criminal penalties, and *even if* those requirements pursue some proprietary objective. Only the government can wield the hammer of the criminal law.

**2.** Government action also has the force of law where it is backed by civil penalties, which are coercive tools unlike the contract remedies available to private businesses. The government may act like a private business, and thus as a market participant, where it makes demands of a contractual counterparty. But it does not act like a private business when it uses civil penalties, like fines.

**3.** *ATA* makes clear that the criminal- and civil-penalties inquiries come first: if government action is backed by penalties, it is regulatory. But

even if the government does not use criminal or civil penalties, it still must prove that its action is not regulatory to claim market participation. *First*, the Court asks whether "the challenged governmental action [is] undertaken in pursuit of the 'efficient procurement of needed goods and services,' as one might expect of a private business in the same situation." *LAX*, 873 F.3d at 1080 (citation omitted). Thus, the government acts as a regulator when it imposes requirements without a party's assent, because only the government can impose binding standards by fiat. *Second*, the Court asks whether "the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than [to] address a specific proprietary problem." *Id.* (citation omitted). If the answer to both questions is "no," then the government action is regulatory. A4A preserves its challenges to these residual tests, which the Solicitor General too has criticized.

**B.** The HAO has the force of law because it is backed by criminal penalties. This straightforward point alone resolves this appeal.

**1.** Under California law, "[v]iolation of a city" or county "ordinance is a misdemeanor unless by ordinance it is made an infraction." Cal. Gov't Code § 25132(a) (county); *id.* § 36900(a) (city). The HAO does not

provide that violations are infractions, so California law makes them misdemeanors. The HAO thus has the force of law.

**2.** The district court refused to read §§ 25132(a) and 36900(a) according to their plain terms, relying instead on a 1977 California Attorney General opinion to conclude that the California legislature did not mean what it said. That was error. The statutes are unambiguous. The district court had no license to second-guess the terms the state legislature enacted.

**C.** The HAO is also regulatory because it is backed by civil penalties. This point, too, can resolve this appeal without further inquiry.

**1.** The HAO imposes multiple civil penalties on airlines that refuse to comply with its terms. A noncompliant airline must pay into the HAP account under the City Option. If it does not, the City may assess penalties of $100 per week per employee; the Airport Director may impose civil fines of $1,000 per employee per day or some higher amount at her discretion; and the City may debar the airline from any future contract for three years. All those consequences are civil penalties for two reasons. *First*, the airlines agreed to none of them—they apply by force of law alone. *Second*, those consequences do not resemble ordinary contract remedies. For example, the

Airport Director's $1,000-and-up fines are unlike liquidated damages, which must be fixed and certain, because the amount is completely discretionary.

**2.** Although the district court acknowledged that civil penalties make government action regulatory, it thought that the airlines voluntarily agreed to the HAO's terms. That is wrong. The lease extensions the airlines signed with the City expressly reserved the right to *challenge* the HAO.

**D.** Even leaving criminal and civil penalties aside, the HAO is regulatory under this Court's residual test for market participation.

**1.** The City fails prong 1 of the *LAX* test because it used tools available only to the government and did not pursue a proprietary interest in enacting the HAO. The City used an ordinance, as only the government can, to impose requirements the airlines never agreed to at the bargaining table. What's more, the purpose of the HAO was to advance a general labor policy of making health benefits more widely available for certain marginalized groups. The City can point to no evidence to carry its burden of proving that it enacted the HAO to reduce employee turnover and restore confidence in the safety of air travel. Besides, promoting airport safety and security—not to mention "the general welfare," *supra* pp. 15-16— is a *regulatory* goal.

**2.** The City fails prong 2 of the *LAX* test because the HAO is not tailored to a proprietary purpose, as the mismatch between the HAO and its alleged purposes shows. For example, the City says the HAO will reduce employee turnover. But the HAO leaves many airport workers with more extensive contact with the public uncovered, from concessionaries to police officers and firefighters. At the same time, it has a spillover effect on airline employees nationwide, who will now need to pay more to subsidize their SFO colleagues' healthcare. The City's overreach—regulating its contracting parties' relationships with their employees—likewise shows that the HAO is regulatory.

**3.** A4A preserves its challenges to the flawed *LAX* test. The scope of government action should be just one consideration, not an entire test. Another consideration should be whether the action affects the government's operation of a public good. Contrary to *LAX*, airports' role as public infrastructure makes them inherently governmental operations.

## ARGUMENT

### A. The government acts as a regulator when it threatens criminal or civil sanctions or otherwise acts as only a government can.

The ultimate questions in this case are whether federal law preempts the HAO or the HAO violates the Contracts Clauses of the U.S. or California Constitutions. The threshold issue on appeal is whether the HAO has "the force and effect of law," because federal law may preempt "a government's exercise of regulatory authority" but not "its own contract-based participation in a market." *ATA*, 569 U.S. at 649-50. Put another way, federal preemption "targets the State acting as a State, not as any market actor—or otherwise said, the State acting in a regulatory rather than proprietary mode." *Id.* at 650; *see* 29 U.S.C. § 1144(a); 49 U.S.C. § 41713(b).

There are three sets of considerations for determining whether state or local action is regulatory or proprietary. *First*, the government "exercise[s] classic regulatory authority"—requiring no further inquiry—when it makes violation of its requirements "a violation of criminal law." *ATA*, 569 U.S. at 650. When the government chooses "to fulfill [its] goals" with a tool "only a government can wield: the hammer of the criminal law," its "intentions are not what matters." *Id.* at 651. *Second*, the government acts as a regulator—

likewise requiring no further inquiry—when it backs its requirements with civil penalties "available to no private party." *Id.* at 651-52. "Only the government can create and administer such a system." *Friends of the Eel River v. North Coast R.R. Auth.*, 399 P.3d 37, 76 (Cal. 2017); *accord Tri-M Group, LLC v. Sharp*, 638 F.3d 406, 425 (3d Cir. 2011).

*Finally*, even when the government does not use criminal or civil sanctions, it still must show that its "action constitutes non-regulatory market participation." *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1024 (9th Cir. 2010). Supreme Court precedent distinguishes between voluntary contractual commitments, like those private parties can make, and "binding standards of conduct that operate irrespective of any private agreement," *Wolens*, 513 U.S. at 229 n.5 (citation omitted), which are "state-imposed obligation[s]" subject to preemption, *Ginsberg*, 572 U.S. at 285-87.

For every consideration under the market-participant inquiry, the questions are what the government did and how it did it. The question is not what the state or local government *could have* done or *could have* included in a contract. Courts cannot uphold regulatory action "on the ground that the [government] could achieve the same end as a market participant" if the

government did something only a government can do. *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 98-99 (1984) (plurality opinion).

### 1. State or local government action has the force of law when it is backed by criminal penalties.

As the district court noted, "[t]here is no dispute that the threat of criminal penalties is a unique governmental function and would make the City a regulator, not a market participant, when enacting the HAO." 1-ER-10.

The principle is straightforward: Government action is regulatory "when the government employs … a coercive mechanism, available to no private party, … whether or not it does so to turn a profit." *ATA*, 569 U.S. at 651-52. When the government uses "the threat of criminal sanctions" to back its demands, it acts as "the government *qua* government, performing its prototypical regulatory role." *Id.* at 651.

The question in *ATA* was whether the Port of Los Angeles' requirements for motor carriers had the force and effect of law. *Id.* at 648-49. To address community concerns about congestion and air pollution caused by drayage trucks moving cargo to and from the Port, the Port put two requirements into its concession agreements with trucking companies. *Id.* at 645. First, the Port required drayage trucks to display placards with phone

numbers for reporting environmental or safety concerns. *Id.* Second, the Port required the drayage companies to submit plans for off-street parking for trucks not in service. *Id.* To ensure that all drayage companies would enter into concession agreements, the Port amended an ordinance to require terminal operators (separate companies) to work only with drayage trucks registered under concession agreements. *Id.* The ordinance made a violation of that requirement a misdemeanor "punishable by a fine of up to $500 or a prison sentence of up to six months." *Id.*

The Supreme Court held that the concession agreements' placard and parking requirements had the force and effect of law because they were enforceable by criminal penalties. *Id.* at 649-52. The Court contrasted "'official, government-imposed policies' prescribing 'binding standards of conduct'" with "'contractual commitment[s] voluntarily undertaken.'" *Id.* at 649 (quoting *Wolens*, 513 U.S. at 229 & n.5 (brackets in original)). Although "everyday contractual arrangements" do not have the force of law, the Port's requirements went beyond "voluntary commitments." *Id.* at 650. Backed by criminal penalties in the Port's ordinance, the concession agreements were "part and parcel of a governmental program wielding coercive power over private parties." *Id.*

The Supreme Court made clear that once criminal penalties came into the picture, the Port could no longer claim it was acting as a market participant. This Court had found that the Port was acting "to enhance goodwill and improve the odds of achieving its business plan—just as a private company might." *Id.* at 651. But the Supreme Court said that "the Port's intentions [were] not what matter[ed]." *Id.* It did not matter that Port was trying to advance its "own 'business interest' in 'managing its facilities'" by "'address[ing] [a] specific proprietary problem[]'—the need to 'increase the community good-will necessary to facilitate Port expansion.'" *Id.* at 647 (first brackets added; citation omitted). Nor did it matter that the concession agreements "spell[ed] out" other "penalties for any signatory trucking company" or that "the Port ha[d] never suspended or revoked a trucking company's license to operate at the Port for a prior violation of one of the contract provisions." *Id.* at 645-46. What mattered was that "the Port chose a tool to fulfill those goals which only a government can wield: the hammer of the criminal law." *Id.* at 651.

## 2. Government action also has the force of law when it is backed by civil penalties.

Government action is also regulatory when it is backed by civil penalties, because unless the government "forgoes the (distinctively governmental) exercise of legal authority," it cannot escape federal preemption. *Id.* at 652. Although *ATA* focused on criminal penalties, the same rule applies to civil penalties, as the district court recognized. *See* 1-ER-14-16; *Tri-M Group*, 638 F.3d at 425; *Friends of the Eel River*, 399 P.3d at 76.

**a.** Start with *Rowe v. New Hampshire Motor Transport Association*, 552 U.S. 364 (2008). *Rowe* held that federal law preempted a Maine statute that imposed civil liability on motor carriers that violated certain requirements when delivering tobacco. *Id.* at 368-69, 371-73. The statute thus "directly regulate[d] a significant aspect of the motor carrier's package pickup and delivery service," "creat[ing] the kind of state-mandated regulation that the federal Act pre-empts." *Id.* at 373.

Next consider *Tri-M Group*, where the Third Circuit held that a Delaware "regulatory scheme for the training and compensation of apprentices on construction projects" had the force of law. 638 F.3d at 425. Civil penalties alone were enough. The court reasoned that "the potential civil penalty

threatened by the State" — between \$1,000 and \$5,000 per violation — did not "reflect mere market participation by private actors." *Id.* The court explained that "[a] governmental entity acts as a market *regulator* when it employs tools in pursuit of compliance that no private actor could wield, such as the threat of civil fines." *Id.* (quoting *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 438 F.3d 150, 157 (2d Cir. 2006)).

The California Supreme Court, too, has concluded that the market-participant offense cannot apply when the government "create[s] and administer[s]" "enforcement mechanisms that would not be available to a private party." *Friends of the Eel River*, 399 P.3d at 76. Treating such a scheme as market participation "would run afoul of the teaching of *American Trucking*." *Id.* "[L]ike the possibility of criminal sanctions in [*ATA*]," such a regime "is not a tool 'that the owner of an ordinary commercial enterprise could mimic.'" *Id.* (quoting *ATA*, 569 U.S. at 651).

This Court's caselaw tracks these principles. The Court has held that a statute coercing compliance with "civil penalties and debarment from bidding on public works contracts for one year ... amount[ed] to regulation, not merely 'market participation.'" *Hydrostorage, Inc. v. Northern Cal. Boilermakers Loc. Joint Apprenticeship Comm.*, 891 F.2d 719, 722, 730 (9th Cir. 1989),

*abrogated on other grounds as stated in Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1044 (9th Cir. 2007). And the en banc Court found a California statute regulatory where "a provision for civil penalties" "permit[ted] private parties to file civil actions against employers who violate the statute." *Chamber of Com. of U.S. v. Lockyer*, 463 F.3d 1076, 1085 (9th Cir. 2006) (en banc), *rev'd sub nom. Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 69-74 (2008) (Ninth Circuit correctly held statute was regulatory but incorrectly found it not preempted).

      **b.**    Before the district court, the City relied on *Engine Manufacturers* to contend that criminal and civil penalties do not "preclude the application of the market participant doctrine." 498 F.3d at 1048. The district court correctly rejected that argument for two reasons. *First*, "*Engine Mfrs.* is no longer good law because in *ATA*, the Supreme Court held that coercive mechanisms that are unavailable to private parties, such as the threat of criminal sanctions, constitute regulatory action." 1-ER-16. *Second*, "*Engine Manufacturers* is inapplicable" "notwithstanding … *ATA*'s holding superseding its decision." 1-ER-16 n.5. *Engine Manufacturers* "permitted state control over the state's own internal purchasing decisions, but did not extend to permitting regulation of private third parties." *Friends of the Eel River*, 399 P.3d at 76. But

"in this case, the issue is not the City's own internal purchasing decisions but the application of the HAO on private third parties." 1-ER-16 n.5.

### 3. The government also acts as a regulator when it otherwise uses governmental tools or proceeds in a way that a private actor could not or would not.

**a.** Even when the government does not use criminal or civil penalties, it still must show that its "action constitutes non-regulatory market participation." *Johnson*, 623 F.3d at 1024. This Court uses a two-part test: "First, is the challenged governmental action undertaken in pursuit of the 'efficient procurement of needed goods and services,' as one might expect of a private business in the same situation?" *LAX*, 873 F.3d at 1080 (citation omitted). "Second, 'does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than [to] address a specific proprietary problem'?" *Id.* (citation omitted). If the answer to both questions is "no," then the action is regulatory. As discussed below, A4A preserves its challenges to this residual framework, which contravenes the proper totality-of-the-circumstances inquiry.

**i.** The first question looks to whether the challenged action is something a private party could and might do in the marketplace. *Johnson*, 623 F.3d at 1024. Thus, government action has the force of law where it

- 36 -

imposes requirements by fiat rather than agreement. In *GSW, Inc. v. Long County*, 999 F.2d 1508, 1514-15 (11th Cir. 1993), for instance, the court held that a county acted in a regulatory capacity where it "did not impose its restriction during the bargaining process before the contract was signed" but imposed "a series of demands … after the contract." The point is that the government acts with the force of law when it tries to unilaterally "enlarge the contractual obligations that the parties voluntarily adopt," *Ginsberg*, 572 U.S. at 276; *see also id.* at 289, and impose "binding standards of conduct that operate irrespective of any private agreement," *Wolens*, 513 U.S. at 229 n.5 (citation omitted). In contrast, where the government uses legislation to establish contractual expectations ex ante, it may act as a market participant. *See, e.g.*, *Antilles Cement Corp. v. Fortuño*, 670 F.3d 310, 330 (1st Cir. 2012).

*ii.* The second question is whether the government's "primary goal was to encourage a general policy" rather than solve "a specific proprietary problem." *LAX*, 873 F.3d at 1080 (citation omitted). Exercising police power—a "distinctively governmental" move, *ATA*, 569 U.S. at 652—fails the test. In *Olympic Pipe Line*, for example, this Court held that Seattle "was acting as a regulator rather than a municipal proprietor" when it contractually required "safety oversight of a hazardous liquid pipeline within

Seattle's city boundaries." 437 F.3d at 874, 881. The Court observed that "Seattle made the safety demands … pursuant to its general duty to protect the public health and safety—a duty grounded in the City's regulatory, police power—rather than in an attempt to protect its role in the real estate market." *Id.* at 881.

**b.**     This Court's two-part framework is flawed. In *LAX*, the Court held that Los Angeles acted as a market participant when it used a license agreement to require airlines and airline service providers to adopt labor-peace agreements with their unions. *See* 873 F.3d at 1077. The case did not involve criminal or civil penalties. Under the first inquiry, the Court held under that the challenged government actions were sufficiently similar to private market behavior, relying in part on the notion that airports are commercial enterprises. *See id.* at 1081-82. Under the second inquiry, the Court found that the labor-peace provisions were not intended to promote the general welfare. *See id.* at 1081-84.

*LAX* is wrong in at least two respects. *First*, airports' nature as public goods is an important factor, as the Solicitor General explained in criticizing *LAX* in certiorari-stage proceedings before the Supreme Court. Br. for the United States as Amicus Curiae 22, *LAX*, No. 17-1183 (U.S.),

- 38 -

https://tinyurl.com/3jksjrwc (OSG *LAX* Br.). *Second*, the second prong of the *LAX* test is unsound because "the narrow scope of governmental action can be an important consideration," but it "is not the only relevant factor." *Id.* at 18. By allowing the inquiry to turn on scope alone, the *LAX* test may "allow state and local governments to escape preemption of what are regulatory measures." *Id.* at 23; *see infra* pp. 66-67.

## B. The HAO has the force of law because it is backed by criminal penalties.

One simple point should resolve this appeal: The HAO cannot be market participation because violating the HAO is a misdemeanor. The district court's contrary ruling disregards the plain meaning of California law.

### 1. Under unambiguous California law, the HAO threatens criminal penalties.

The HAO cannot be market participation because violating the HAO is a misdemeanor. California law states that "[v]iolation of a city" or county "ordinance is a misdemeanor unless by ordinance it is made an infraction." Cal. Gov't Code § 25132(a) (county); *id.* § 36900(a) (city). The HAO does not make a violation an infraction, and a misdemeanor is a crime "punishable by imprisonment in the county jail not exceeding six months, or by fine not exceeding one thousand dollars ($1,000), or by both." Cal. Penal Code § 19.

Just like the ordinance in *ATA*, the HAO coerces compliance by "threat of criminal sanctions." 569 U.S. at 651. "Slice it or dice it any which way," San Francisco "acted with the 'force of law'" in enacting the HAO. *Id.* at 652.

### 2.     The district court's reasoning is wrong.

The City and district court alike ultimately recognized that if the HAO is backed by criminal penalties, it has the force of law and is subject to preemption. 1-ER-10; Dist. Ct. Doc. No. 44, at 5-6. Their response was that §§ 25132(a) and 36900(a) do not mean what they say because their plain meaning would produce "absurd results." 1-ER-11; *see* Dist. Ct. Doc. No. 41, at 27. That analysis is wrong.

**a.**     The district court relied mainly on a single 1977 opinion from the California Attorney General that rejected "a literal interpretation" of §§ 25132(a) and 36900(a). *MacMillen*, 1977 WL 24859, at *4. In the Attorney General's view, the statutes "make[] the violation of a city or county ordinance either a misdemeanor or an infraction only when the violation is declared to be a misdemeanor or infraction by express ordinance language." *Id.* at *6. The opinion reasoned that "[i]t does not seem reasonable that the Legislature … intended … to make the violation of every outstanding and future county ordinance in California a criminal offense." *Id.*

That reasoning fails. "When, as here, 'statutory language is clear and unambiguous there is no need for construction, and courts should not indulge in it.'" *California Fed. Sav. & Loan Ass'n v. City of Los Angeles*, 902 P.2d 297, 300 (Cal. 1995) (citation omitted). Courts "may not, under the guise of construction, rewrite the law or give the words an effect different from the plain and direct import of the terms used." *Id.* at 301. Indeed, the Supreme "Court has explained many times over many years that, when the meaning of the statute's terms is plain, [a court's] job is at an end." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1749 (2020). Thus, California courts have repeatedly rejected the Attorney General's attempt to interpret statutes that are "clear and unambiguous and … susceptible of only one interpretation, what it says." *County of Fresno v. Clovis Unified Sch. Dist.*, 204 Cal. App. 3d 417, 429 (1988); *see also, e.g.*, *People v. Garth*, 234 Cal. App. 3d 1797, 1800-01 (1991).

The district court violated this bedrock principle. The statutes say that violation of an ordinance "*is* a misdemeanor unless by ordinance it is made an infraction." Cal. Gov't Code § 25132(a) (county) (emphasis added); *id.* § 36900(a) (city) (emphasis added). Those words are unambiguous, so the "first step of the interpretive inquiry is [the] last." *Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019). Thus, as the California Supreme Court has put it, "the

violation of a County ordinance is a misdemeanor" under § 25132(a). *Great W. Shows, Inc. v. County of Los Angeles*, 44 P.3d 120, 132 (Cal. 2002); *accord, e.g., People v. Minor*, 96 Cal. App. 4th 29, 39 (2002). Federal courts have understood the statutes the same way. *See Sahab v. Baca*, No. 11-7061, 2014 WL 102410, at *8 (C.D. Cal. Jan. 8, 2014).

More recent Attorney General opinions also recognize that §§ 25132(a) and 36900(a) mean what they say. At least two opinions have explained that "a violation of a city ordinance is a misdemeanor unless by ordinance it is made an infraction," and that violations "may be made misdemeanors simply by not making them infractions." *Honorable James F. Penman*, 94 Ops. Cal. Att'y Gen. 39, 2011 WL 6753986, at *2 (2011) (citing Cal. Gov't Code § 25132(a)); *accord Honorable James B. Lindholm, Jr.*, 63 Ops. Cal. Att'y Gen. 418, 1980 WL 96857, at *2 (1980). A third opinion noted that a proposed "ordinance would be subject to enforcement" under § 25132(a) as a misdemeanor. *Honorable Michael R. Capizzi*, 74 Ops. Cal. Att'y. Gen. 211, 1991 WL 495486, at *2 & n.1 (1991).

**b.** The district court defended its reliance on *MacMillen* by reasoning that the California legislature later amended the statutes and "would

have corrected the language if the Attorney General opinions misconstrued the law." 1-ER-12. That ratification reasoning fails for three reasons.

*First*, and most importantly, when a statute's meaning is plain, the inquiry begins and ends with the text. *Rotkiske*, 140 S. Ct. at 360. California courts have said that "when the plain meaning of a statute is clear," courts "are not at liberty to consider extrinsic aids such as legislative history," and have examined Attorney General opinions only to show that they lead to the same result—*not* to suggest that they can produce a different one. *People v. Miller*, 23 Cal. App. 5th 973, 982-83 (2018); *see also, e.g.*, *People v. Gjersvold*, 230 Cal. App. 4th 746, 750 (2014). Nor does *California Association of Psychology Providers v. Rank*, 51 Cal. 3d 1, 12-13, 14-19 (1990) support the district court's reasoning. There, the court gave the "clear" statutory language its "[p]lain [m]eaning" before discussing an Attorney General opinion in *rejecting* such an end run around plain meaning. *See id.* Finally, *County of San Diego v. State*, 931 P.2d 312, 332-34 (1997), does not support the district court's ruling either, because the statute there "d[id] not define" the disputed term.

*Second*, even assuming the Attorney General's views are relevant, the Attorney General abandoned *MacMillen*'s atextual construction after just three years. *See supra* p. 42. California's Legislative Counsel has rejected that

reading, too, and there is no reason to give Legislative Counsel's views less weight than an outlier Attorney General opinion. Legislative Counsel's summaries "are entitled to great weight," and "[i]t is reasonable to presume that the Legislature amended those sections with the intent and meaning expressed in the Legislative Counsel's digest." *Jones v. Lodge at Torrey Pines P'ship*, 177 P.3d 232, 240 (Cal. 2008) (citation omitted). Here, Legislative Counsel summaries to amendments to §§ 25132(a) and 36900(a) have repeatedly explained that "[e]xisting law provides with respect to city and county ordinances that the violation of an ordinance is a misdemeanor unless the ordinance makes it an infraction." 2003 Cal. Legis. Digest Ch. 60 (S.B. 567), https://tinyurl.com/yu7djzph; *accord* 2018 Cal. Legis. Digest Ch. 970 (A.B. 2598), https://tinyurl.com/2p8bd6fm; 2021 Cal. Legis. Digest Ch. 307 (S.B. 60), https://tinyurl.com/2n3x5rfr. Beyond all that, the preamble to the 2017 amendment, by referring to "[w]here the violation would *otherwise* be an infraction," makes clear that ordinance violations are misdemeanors by default. 2017 Cal. Legis. Digest Ch. 405 (A.B. 556), https://tinyurl.com/25utfte8 (emphasis added).

*Finally*, the district court's notion that the legislature must respond to an Attorney General opinion lest it become law turns the separation of

powers on its head. *Cf. Rotkiske*, 140 S. Ct. at 360-61. The legislature does not need to play Whac-A-Mole to prevent the Attorney General from adding qualifications to unambiguous statutory text. And what would the legislature say, anyway? We said what we meant and we meant it? Statutory text does not pick up a new meaning just because the legislature does "[n]othing" to it. *E.g.*, *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 966-67 (2017).

   **c.**      The district court also relied on *First Resort, Inc. v. Herrera*, 860 F.3d 1263 (9th Cir. 2017), and *Prime Gas, Inc. v. City of Sacramento*, 184 Cal. App. 4th 697 (2010), for the proposition that "certain California ordinances only provided for civil enforcement without criminal penalties." 1-ER-13-14. But neither decision held anything to that effect. Instead, those decisions made that observation only in passing—and without even mentioning § 25132(a) or § 36900(a). Of course, "cases are not precedential for propositions not considered." *United States v. Pepe*, 895 F.3d 679, 688 (9th Cir. 2018); *see California Bldg. Indus. Ass'n v. State Water Res. Control Bd.*, 4 Cal. 5th 1032, 1043 (2018).

   Decisions that *have* examined §§ 25132(a) and 36900(a), in contrast, have read them to mean what they say. *See, e.g.*, *Minor*, 96 Cal. App. 4th at

39; *Sahab*, 2014 WL 102410, at \*9. In *Sahab*, for instance, the court rejected a challenge to convictions for violating a parking-lot-related ordinance under the Los Angeles Municipal Code (LAMC), holding that both LAMC § 11.00(m) and § 36900(a) "explicitly and unambiguously" make all LAMC violations misdemeanors. 2014 WL 102410, at \*9. Rebuffing the habeas petitioner's argument that he was deprived of notice because "there is no reference to criminal penalties" in the ordinance he violated, the court explained that § 36900(a) "makes any violation of a city ordinance a misdemeanor unless by ordinance it is made an infraction." *Id.* at \*2, \*8. The court gave § 36900 and § 11.00(m) their "plain meaning," rejecting the petitioner's argument that they would "lead to 'preposterous' results" as an argument for the legislature. *Id.* at \*9.

The district court tried to distinguish *Sahab* because the LAMC "contained a general provision"—§ 11.00(m)—"making any violation of the Code a misdemeanor unless explicitly made an infraction." 1-ER-13. That reasoning makes no sense. Section 11.00(m) *means the same thing* as § 36900(a), as *Sahab* explained: a violation or failure to comply is "a misdemeanor unless that violation or failure is declared in this Code to be an infraction." 2014 WL 102410, at \*5 (quoting LAMC § 11.00(m)). So if the local and state law

- 46 -

provisions, with unambiguous parallel wording, mean the same thing, and the local provision makes a violation a misdemeanor, then so does the state provision.

   **d.**   In the end, the district court's holding rests on the notion that giving §§ 25132(a) and 36900(a) their plain meaning "would produce absurd results" by making "every violation of any local ordinance … a misdemeanor." 1-ER-11-12. That reasoning fails.

   *First*, the court ignored the statutes' language about infractions. The statutes "create a *default* classification of misdemeanors for code violations." *Minor*, 96 Cal. App. 4th at 39 (emphasis added). All a locality has to do to avoid misdemeanor treatment is say that a violation is an infraction. Plus, §§ 25132(a) and 36900(a) provide that although a violation "may be prosecuted by county authorities," it may also be "redressed by civil action."

   *Second*, the district court's notions about purpose did not license it to ignore the statutes' words. Again, "[t]he plain meaning of words in a statute may be disregarded only when that meaning is repugnant to the general purview of the act or for some other compelling reason." *People v. Leal*, 94 P.3d 1071, 1076 (Cal. 2004) (citation and quotation marks omitted). The legislature does not need to "set forth its reasons" for choosing certain

language, and courts cannot "insert what has been omitted or omit what has been inserted." *Id.* at 1076-77 (citations omitted). Had the California legislature intended the district court's reading, "it could easily have said so." *Id.* at 1077. The court's job was not "to judge the wisdom of the Legislature's policy decisions." *People v. Giordano*, 170 P.3d 623, 635 (Cal. 2007).

### C. The HAO has the force and effect of law because it is backed by civil penalties.

Criminal sanctions aside, the HAO is regulatory because it threatens civil penalties. The HAO gives the City several tools available only to the government to enforce the HAO, including the City Option itself, which imposes hourly fines on airlines without platinum plans. Most notably, no private business can impose a discretionary fine like the $1,000-and-up daily fine the Airport Director may levy. The district court's contrary reasoning brushed over the airlines' refusal to agree to the HAO; disregarded the dissimilarity between the HAO's consequences and ordinary contract remedies; and ignored the plain text of the HAO and San Francisco Administrative Code.

### 1.    The HAO is backed by civil penalties.

The HAO is backed by several civil penalties unlike those available to private contracting parties. The airlines never agreed to the HAO, and agreement is the key component of any contract. Without an agreement, the HAO's consequences are civil penalties that only a government can impose by fiat. What's more, the HAO's consequences go further than any private party could even under in a contract.

**a.**    As noted, if an employer fails to provide free platinum-level healthcare benefits to employees and their dependents, the City may:

- charge the employer for amounts that should have been paid into a HAP account under the City Option;

- assess penalties of $100 per week per employee;

- cancel any contract the City has with the employer;

- bar the employer from entering into any future contract with the City for three years;

- institute a civil action against the employer; and,

- under the QSP, impose civil fines of $1,000 per employee per day, or an even higher amount "at the discretion of the Airport Director."

*Supra* p. 15.

The airlines never agreed to those terms. Instead, the HAO simply imposed them. Indeed, the HAO expressly *forbids* waiver of its requirements by collective-bargaining agreement, meaning that the contracting parties are powerless to change it. 2-ER-72. Put another way, the City imposed obligations beyond those "that the parties voluntarily undertook," *Ginsberg*, 572 U.S. at 285, 287, and that "operate irrespective of any … agreement," *Wolens*, 513 U.S. at 229 n.5 (citation omitted). The HAO is regulatory because it "does not authorize parties to free themselves" from its healthcare-benefits requirements or consequences for noncompliance. *Ginsberg*, 572 U.S. at 287.

**b.**     Lack of agreement aside, the HAO's consequences for noncompliance are also civil penalties because they go beyond the ordinary contract remedies available to private parties.

*i.*     Start with the provision in the QSP that allows fines of $1,000 per employee per day for any violation—and "[s]uch fine amount may be increased from time to time at the discretion of the Airport Director." 4-ER-505. Not only does the provision *say* that the amount is a "fine," but it also gives the Airport Director ostensibly unfettered discretion to assess that fine. No contract provision can do that. Liquidated damages, for instance, must be "fixed and certain by agreement." *Chodos v. West Publ'g Co.*, 292 F.3d 992,

1002 (9th Cir. 2002) (citation omitted). The Airport Director's discretion to increase the amount means the amount is by definition not "fixed and certain by agreement."

*ii.* The $100-per-employee-per-week penalties are not analogous to liquidated damages, either. The amount of liquated damages needs to be more than just "fixed and certain by agreement." It also "'must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained.' … In the absence of such relationship, a contractual clause purporting to predetermine damages 'must be construed as a penalty.'" *Ridgley v. Topa Thrift & Loan Ass'n*, 953 P.2d 484, 488 (Cal. 1998) (citation omitted). Of course, there was no such agreement or relationship to provide employees and their families with free platinum-level healthcare benefits. Nor was there any "reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." The amount is simply a unilateral declaration by the City, which, for that matter, does not "sustain[]" "any loss." And the amount is not even a unilateral *estimate*. It applies no matter the consequences of the breach. *See* S.F. Admin. Code § 12Q.5.1. For all these reasons, the term "must be construed as a penalty." *Ridgley*, 953 P.2d at 488 (citation omitted).

*iii.* Debarment, too, goes too far. Although a private party could decide not to contract with a breaching party the next time around, debarment is a complete ban on working together for several years. *See* S.F. Admin. Code § 28.11. Debarment is a civil penalty that makes government action "regulation, not merely 'market participation.'" *Hydrostorage*, 891 F.2d at 722, 730; *accord Tri-M Group*, 638 F.3d at 425.

*iv.* Finally, consider the City Option, which demands $9.50 per hour per employee, for no consideration and without agreement. For the City Option not to be a penalty, it must provide airlines "with a true alternative performance" to meeting the HAO's platinum healthcare-benefits requirement. *Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.*, 232 Cal. App. 4th 1332, 1358 (2015). An alternative must "provide[] a rational choice between two reasonable possibilities." *Id.* The City Option does not.

*First*, for airlines that wish to keep providing non-platinum plants—including plans that their employees collectively bargained for—the City Option is not an *alternative* but a duplicative penalty. The airlines must keep providing existing benefits *and* pay money into the HAP.

*Second*, the City does not dispute that the City Option is a civil penalty if airline employees are not entitled to the money that airlines pay into the

HAP accounts. After all, the City Option cannot be an alternative if it is not set up to provide employees and their families with healthcare. The problem is that the City's Administrative Code permits only "Covered Employees" to access money from HAP accounts, and SFO workers whose employers pay into the HAP accounts are specifically excluded from the definition of "Covered Employees." *Supra* pp. 12-13. Indeed, the City *admits* that, under the plain administrative text, airline employees cannot access HAP funds. *See* Dist. Ct. Doc. No. 41, at 19.

For all these reasons, the HAO is backed by civil penalties. Those penalties are designed to coerce compliance with the HAO's unilaterally imposed terms. The HAO therefore has the force and effect of law.

### 2. The district court's analysis was wrong.

The City did not dispute, and the district court agreed, that "the use of coercive mechanisms are not available to private parties constitute[s] regulatory action." 1-ER-17-18. But the court thought the HAO's provisions do not contain civil penalties. That was error.

**a.** The district court first concluded that "A4A members voluntarily agreed to [the HAO's] requirements" when they signed the lease extensions. 1-ER-18. But nowhere in the lease extensions did the airlines

agree to be bound by the HAO. To the contrary, the parties *reserved the airlines' right to challenge* the HAO:

> Neither the execution of this Modification by Airline or City, nor the performance by either party under the Existing [lease] or this Modification, shall in any way prejudice or constitute a waiver of: (a) Airline's right to challenge the [HAO] or the validity or enforcement thereof, or (b) the rights of either party to fully prosecute or defend, as applicable, any lawsuit by the Airline against the City challenging the [HAO].

3-ER-221. Reading the lease extensions to provide that the airlines agreed to the HAO not only inserts terms into the lease extensions, but it eviscerates the Reservation of Rights. It "prejudice[s]" or "waive[s]" the airlines' right to challenge "the validity" of the HAO even though the reservation says that the extension must not do that "in any way."

The district court seems to have thought that the airlines agreed to the HAO "when they chose to extend their [lease extensions] for another two years." 1-ER-18. That was so, in the district court's view, because the lease extensions "include a provision where the contracting airlines agrees [sic] to comply with the HCAO and its future amendments, *e.g.*, the HAO." 1-ER-29. That reasoning fails.

*First*, it is textually unsupportable, because even assuming the HAO is simply an amendment to the HCAO, the reservation of rights expressly

carved out the HAO. The district court's reading nullifies the lease extensions' specific provision carving out the HAO.

*Second*, although the airlines agreed to be bound by the HCAO as it "may be amended from time to time," the HAO did not simply "amend" the HCAO. 1-ER-5 (citation omitted). It completely rewrote the HAO, selectively targeting just airlines and airline service providers. Before the HAO, the HCAO was a uniform healthcare law that applied to all parties entering into certain contracts with the City. 1-ER-4-5. Thus, any change to the HCAO would apply to *all* such counterparties. That was an important political check on the City's ability to target any particular parties without broad buy-in. But the HAO targets just the airlines, leaving every other City counterparty untouched.

*Third*, viewing the HAO's onerous changes as a mere amendment is not reasonable. The HAO imposes novel healthcare requirements, with the City Option costing more than the federal minimum wage. The benefits requirements thus dramatically interfere with airlines and airline service providers' relationship with their employees and the cost of those employees. And there is no out—unlike the HCAO, the HAO cannot be waived by collective-bargaining agreement.

- 55 -

*Finally*, as a matter of basic contract law, the HAO exceeds the scope of what the airlines could have agreed to. If the original 2010 agreements' language agreeing to HCAO amendments reaches the HAO, then those agreements are fatally indefinite. *See Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 791, 795-96 (1998). Any such "amendment" would fail for lack of consideration. *See Krobitzsch v. Middleton*, 72 Cal. App. 2d 804, 808 (1946).

**b.** The district court also thought the HAO's consequences for non-compliance "are functionally equivalent to ordinary commercial contract terms wherein contract parties may agree to certain consequences for breach." 1-ER-18. In particular, the court thought that the $100-per-week and $1,000-plus-at-the-Airport-Director's-discretion provisions are analogous to liquidated damages because they are "contractually based" and represent "a reasonable estimate of the harm that would be caused by violations of the HCAO." 1-ER-21-22. According to the court, "[t]he City and the airlines were free to argue that imposing liquidated damages would be reasonable or unreasonable, just as parties to private commercial contracts with similar terms are free to do so." 1-ER-22. That reasoning fails.

*First*, as discussed, the HAO's terms are not contractually based just because violations of the novel HAO trigger the same consequences as

violations of *other* ordinances (like the HCAO) to which the airlines *did* agree. *Second*, that very reasoning—that the HCAO's $100-per-week and the $1,000-plus-at-the-Airport-Director's-discretion provisions simply carry over to the HAO—proves why those provisions do *not* provide reasonable estimates of harm. If those sums are reasonable estimates of harm for violating *a different* ordinance, what makes them reasonable estimates of the harm from violating from the HAO's *new* requirements? The answer is that they're not estimates, much less bilateral ones—and the City has presented no evidence that they are. *Finally*, it is unclear why the court thought that the airlines could simply argue that those provisions were unenforceable, since they do not purport to be contract terms (to which contract principles would apply). To the contrary, San Francisco law purports to give the City the power to pursue those fines outside of a contract action and, at least in the first instance, even outside of court. S.F. Admin. Code § 12Q.5.2. "Only the government can create and administer such a system." *Friends of the Eel River*, 399 P.3d at 76.

**c.** Finally, the district court thought the City Option is not a penalty because it provides an alternative to the platinum plans the HAO otherwise requires. 1-ER-19-21. But the district court (like the City) recognized that

"A4A is correct under the literal interpretation" of the HAO and the San Francisco Administrative Code that airline employees cannot access City Employee funds. No matter, said the District Court, because the City has chosen to make payments to airline employees anyway. *See* 1-ER-21. That was error. Whether a law is preempted does not turn on how the locality voluntarily chooses to enforce it. Indeed, in *ATA*, the Supreme Court held that the Port of Los Angeles' requirements were preempted based on "the *threat* of criminal punishment." 569 U.S. at 644, 650 (emphasis added). The Court mentioned nothing about any prior prosecution and observed that "the Port has never suspended or revoked a trucking company's license to operate at the Port for a prior violation of one of the contract provisions." *Id.* at 646; *see also Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 769 (4th Cir. 2018).

### D. Criminal and civil penalties aside, the HAO has the force and effect of law because it is uniquely governmental.

When the government backs its demands with criminal or civil sanctions, its action is regulatory and the market-participation inquiry ends. But even where the government does not use criminal or civil penalties, it still must prove that its action is not regulatory. *Johnson*, 623 F.3d at 1024. The first question is whether "the challenged action" is "undertaken in pursuit

of the efficient procurement of needed goods and services, as one might expect of a private business in the same situation." *LAX*, 873 F.3d at 1080 (citation and quotation marks omitted). The test thus looks to both the *means* the government uses and the *end* it pursues. The second question is whether "the narrow scope of the challenged action defeat[s] an inference that its primary goal was to encourage a general policy rather than [to] address a specific proprietary problem." *Id.* (citation omitted). Here, the answer to both these questions is "no."

> **1.    The City fails prong 1 of the *LAX* test because it used tools available only to the government and did not pursue a proprietary interest in enacting the HAO.**

**a.    Means.** In enacting the HAO, the City did something only a government could: it used legislation to unilaterally impose requirements to which the contracting parties did not agree. As the Eleventh Circuit explained in *GSW*, the government acts as a regulator when, for instance, it imposes a restriction not agreed to during the "bargaining process." 999 F.2d at 1514. Here, the City imposed the HAO on unwilling airlines purporting to "enlarge the contractual obligations that the parties voluntarily adopt[ed]." *Ginsberg*, 572 U.S. at 276. No private party has that power, which

exceeds what "one might expect of a private business in the same situation." *LAX*, 873 F.3d at 1080.

The City acted unlike a contracting party in other ways, too. When the City negotiates leases with airlines, it works through the Commission, the entity that operates SFO. But with the HAO, the Commission had "no authority" and played "no role." *Supra* pp. 9-10; 2-ER-89, 2-ER-107.

The district court tried to distinguish *GSW* on the ground that the lease extensions "include[d] a provision where the contracting airlines agree[d] to comply with the HCAO and its future amendments, *e.g.*, the HAO." 1-ER-29. But as explained, the airlines did *not* agree to comply with the HAO and instead reserved their right to challenge it. *Supra* pp. 16-17, 53-56. In sum, the City fails the first prong of the *LAX* test because it acted like a regulator, not a private business.

**b.** **Ends.** The HAO also fails the first prong of the *LAX* test because the City did not pursue a proprietary purpose in enacting it. The HAO amendment stresses that, "[i]n undertaking the adoption and enforcement of this ordinance, the City is undertaking only to promote *the general welfare*." 2-ER-140 (emphasis added). And the HAO explains that it seeks to address "escalating health care costs" and to ensure that "people of color" and those

belonging to "racial and ethnic minority groups" who have been "dispro-portionately impacted by COVID-19" can access affordable healthcare. 2-ER-64-65. Pursuing the "general welfare" is an objective "grounded in the [gov-ernment's] regulatory, police power." *Olympic Pipe Line*, 437 F.3d at 881. The HAO pursues a particular "labor policy," not "the efficient procurement of goods and services." *Tri-M Group*, 638 F.3d at 422 (quoting *Brown*, 554 U.S. at 70). The record makes that clear as a practical matter, too. Although the Airport and the Commission did not have authority to impose the HAO and the Airport Director did not believe it was "the right time" for the HAO, 2-ER-99, the Board enacted it anyway.

The district court reasoned that the City "enacted the HAO to increase the safety and efficiency of the Airport by expanding access to health bene-fits to reduce employee turnover" and "to restore public confidence in the safety of air travel." 1-ER-30. But that reasoning fails for three reasons. *First*, those purposes are not proprietary in the first place. Airport safety is a gov-ernmental objective—just look at the Transportation Security Administration. *See supra* pp. 36-38. *Second*, there is no evidence in the record to carry the City's burden to show that the City enacted the HAO to advance those purposes. Contrary to the district court's reasoning, *see* 1-ER-32-33, the

problem is not one of subjective motivation. The problem is that there is no evidence that the HAO will advance the proclaimed purposes. All the record shows is that union lawyers, likely aware of the market-participation doctrine, wrote the HAO and its findings. *Supra* pp. 13-14. If all it took were lawyers' assertions to nullify federal preemption, then the market-participation test would let local governments get away with the very kind of behavior the RLA proscribes. The RLA preempts labor's efforts "not to bargain with employers, but instead, to seek to set minimum wage and benefit packages with political bodies." *Chamber of Com. of U.S. v. Bragdon*, 64 F.3d 497, 504 (9th Cir. 1995). That is exactly what the unions did here.

*Third*, the notion that the HAO will "restore public confidence in the safety of air travel" is not even *rational*. Passengers might be concerned about COVID-19, but that does not mean they pick airports based on whether airline employees have employer-paid health benefits. But they might want to know that airport employees are vaccinated and are adequately sanitizing the airplanes, or that concession workers are not sneezing the virus into their food. But the HAO does not do anything on those fronts. The only logical inference is that restoring public confidence in the safety of air travel "is not the objective" of the HAO. *Brown*, 554 U.S. at 70.

### 2. The City fails prong 2 of the *LAX* test because the HAO is not tailored to a proprietary purpose.

The HAO also fails the second prong of the *LAX* test because the HAO is not tailored to a proprietary purpose. The HAO is both underinclusive—because it does not protect all employees working at the airport—and over-inclusive—because it has national impact.

**a.** One sign of "pretext" is a "mismatch" between the asserted purposes and the challenged action. *Metropolitan Milwaukee Ass'n of Com. v. Milwaukee County*, 431 F.3d 277, 281-82 (7th Cir. 2005). In *Brown*, for instance, the Supreme Court cited a California statute's underinclusiveness as a reason for holding that California acted as a regulator rather than a market participant. *See* 554 U.S. at 71. "Instead of forbidding the use of state funds for *all* employer advocacy regarding unionization," the Court explained, the challenged law "permit[ted] use of state funds for *select* employer advocacy activities that promote unions." *Id.*

The HAO is both underinclusive and overinclusive. It leaves many airport-based workers uncovered, from concessionaries to police officers and firefighters, even though those employees interact with passengers and perform key safety and security functions. *Supra* pp. 13-14. Yet it

simultaneously applies to workers whose primary duties do not involve interacting with the public, like mechanics and baggage handlers. The mismatch here is not just poor business judgment. It is a sign of regulation.

According to the district court, the *LAX* "inquiry addresses '[c]oncerns about overbreadth,' not underinclusiveness." 1-ER-36 (quoting *LAX*, 873 F.3d at 1084). But that is the kind of cramped thinking that prompted the Solicitor General to call the Ninth Circuit's analysis "flawed," OSG *LAX* Br. 18, as discussed below (at 66-67). *Brown* makes clear that lack of uniformity can help ferret out pretext, and the HAO does not apply uniformly because it is both under- and overinclusive.

**b.**    Another sign that a challenged action exceeds any proprietary interests is that it targets private contracts rather than the contract with the government. The market-participation "doctrine is not *carte blanche* to impose any conditions that the State has the economic power to dictate, and does not validate any requirement merely because the State imposes it upon someone with whom it is in contractual privity." *Wunnicke*, 467 U.S. at 97 (plurality opinion). Thus, the Supreme Court rejected a market-participation argument where the challenged action "addressed employer conduct unrelated to the employer's performance of contractual obligations to the State."

- 64 -

*Building & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 228-29 (1993) (discussing *Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 289-91 (1986)). Similarly, "a state does not act within the market participant exception when its actions significantly affect markets other than the market in which it is a participant by imposing conditions on parties with whom it contracts." *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 625 (5th Cir. 2010); *see also Tri-M Group*, 638 F.3d at 422; *GSW*, 999 F.2d at 1513.

The HAO fails that metric. It regulates airlines' and airline service providers' relationships with their employees and thus should require a more substantial justification. *See* OSG *LAX* Br. 19. But for the reasons explained, there is no such justification. And the HAO does not just affect third-party employees who work at SFO. It also affects airline employees with no connection to SFO. If forced to fully cover healthcare costs for their employees at SFO, airlines likely will be less able to defray the costs of healthcare for their workers at other airports, who may thus need to pay more for their premiums. That is a "spillover effect on private labor relations" between airlines and employees nationwide, and it confirms that the City's invocation

of proprietary interests is "pretext." *Metropolitan Milwaukee Ass'n*, 431 F.3d at 279, 282.

###### 3. The *LAX* test is flawed, as the Solicitor General has explained, and the HAO also has the force and effect of law under the correct test.

Although the HAO is regulatory even under *LAX*, the *LAX* test is "flawed." OSG *LAX* Br. 18. *First*, the "narrow scope" inquiry is misguided, because although scope is "can be an important consideration," it " is not the only relevant factor." *Id.* By allowing the government to establish market participation based on scope alone, the *LAX* test "could allow state and local governments to escape preemption of what are regulatory measures." *Id.* at 23. Here, assuming the HAO is narrowly limited to SFO, that scope does not show that the HAO is market participation. To the contrary, the HAO has the force and effect of law because it imposes binding requirements by fiat.

*Second*, the *LAX* test discounts important circumstances that should inform "the ultimate inquiry" into "whether the government's conduct is proprietary or regulatory." *Id.* at 18. A key factor here is the public nature of airports, which the *LAX* test dismisses as irrelevant. *See id.* at 19-23. But the parties agree that *all* international airports in the United States are publicly owned, 2-ER-166, so running an international airport inherently means

doing something only a government can do. The City's government-only powers over SFO drive the point home. *Selevan v. New York Thruway Auth.*, 584 F.3d 82, 93-94 (2d Cir. 2009) (rejecting market-participant argument by New York Throughway Authority (NYTA) as to its policy over toll roads because, "[u]nlike a private actor," the NYTA had governmental powers like eminent domain). For instance, the City can use (and has used) eminent domain to secure land for SFO. 2-ER-166, 2-ER-174. And divisions of both the San Francisco Police Department and the San Francisco Fire Department protect SFO. These are all classic government functions.

*     *     *

"Slice it or dice it any which way," the HAO has the "force of law." *ATA*, 569 U.S. at 652. Although San Francisco may claim that it will enforce the HAO only in administrative proceedings or "by civil action," Cal. Gov't Code §§ 25132(a), 36900(a), California law unambiguously makes a violation of the HAO a misdemeanor. What's more, the HAO imposes civil penalties available only to the government, including the discretion to impose fines of $1,000 per day *or more*. No private contracting party has such powers. And even leaving criminal and civil penalties aside, no private party has the power to demand compliance with its requirements by fiat.

## CONCLUSION

The Court should reverse the judgment of the district court and remand for further proceedings.

Dated: September 12, 2022             Respectfully submitted,

*/s/ Shay Dvoretzky*

Jason D. Russell                      Shay Dvoretzky
Zachary M. Faigen                       *Counsel of Record*
Mitchell A. Hokanson                  Parker Rider-Longmaid
SKADDEN, ARPS, SLATE,                 Hanaa Khan
  MEAGHER & FLOM LLP                  SKADDEN, ARPS, SLATE,
300 South Grand Ave., Ste. 3400         MEAGHER & FLOM LLP
Los Angeles, CA 90071                 1440 New York Ave., NW
                                      Washington, DC 20005
Patricia N. Vercelli                  Telephone: 202-371-7000
Riva Parker                           shay.dvoretzky@skadden.com
AIRLINES FOR AMERICA
1275 Pennsylvania Ave., NW
Washington, DC 20004

*Counsel for Plaintiff-Appellant Airlines for America*

- 68 -

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-15677

I am the attorney or self-represented party.

**This brief contains** | 13,998 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

(○) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

(○) is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

(○) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

(○) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    (○) it is a joint brief submitted by separately represented parties;

    (○) a party or parties are filing a single brief in response to multiple briefs; or

    (○) a party or parties are filing a single brief in response to a longer joint brief.

(○) complies with the length limit designated by court order dated [                ].

(○) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Shay Dvoretzky | **Date** | Sep 12, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2022, I electronically filed this brief and addendum with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 12, 2022          Respectfully submitted,

*/s/ Shay Dvoretzky*
Shay Dvoretzky
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Plaintiff-Appellant*
*Airlines for America*

[This page intentionally left blank.]

# INDEX OF ADDENDUM

**Page**

29 U.S.C. § 1144. Other laws ...................................................................73

49 U.S.C. § 41713. Preemption of authority over prices, routes, and
     service ...............................................................................................73

Cal. Gov't Code § 25132. Misdemeanor; violation reduced to
     infraction by ordinance; prosecution; fines for infractions;
     hardship waivers .............................................................................75

Cal. Gov't Code § 36900. Violation; offense; prosecution; action;
     penalty; hardship waivers ..............................................................80

S.F. Admin. Code § 12Q2.16. San Francisco Airport Service
     Employees. ......................................................................................83

S.F. Admin. Code § 12Q.3. Health Care Accountability Components. ........84

S.F. Admin. Code § 12Q.5. Administration and Enforcement. ....................93

S.F. Admin. Code § 12Q.5.1. Additional Contract Requirements:
     Liquidated Damages. ......................................................................95

# ADDENDUM

## 29 U.S.C. § 1144. Other laws

## (a) Supersedure; effective date

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

…

## 49 U.S.C. § 41713. Preemption of authority over prices, routes, and service

(a) DEFINITION.—In this section, "State" means a State, the District of Columbia, and a territory or possession of the United States.

(b) PREEMPTION.—(1) Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

(2) Paragraphs (1) and (4) of this subsection do not apply to air transportation provided entirely in Alaska unless the transportation is air

transportation (except charter air transportation) provided under a certificate issued under section 41102 of this title.

(3) This subsection does not limit a State, political subdivision of a State, or political authority of at least 2 States that owns or operates an airport served by an air carrier holding a certificate issued by the Secretary of Transportation from carrying out its proprietary powers and rights.

(4) TRANSPORTATION BY AIR CARRIER OR CARRIER AFFILIATED WITH A DIRECT AIR CARRIER. —

(A) GENERAL RULE. — Except as provided in subparagraph (B), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier or carrier affiliated with a direct air carrier through common controlling ownership when such carrier is transporting property by aircraft or by motor vehicle (whether or not such property has had or will have a prior or subsequent air movement).

(B) Matters not covered. — Subparagraph (A) —

(i) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose

highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization; and

(ii) does not apply to the transportation of household goods, as defined in section 13102 of this title.

(C) APPLICABILITY OF PARAGRAPH (1).—This paragraph shall not limit the applicability of paragraph (1).

## Cal. Gov't Code § 25132. Misdemeanor; violation reduced to infraction by ordinance; prosecution; fines for infractions; hardship waivers

(a) Violation of a county ordinance is a misdemeanor unless by ordinance it is made an infraction. The violation of a county ordinance may be prosecuted by county authorities in the name of the people of the State of California, or redressed by civil action.

(b) Every violation that is an infraction is punishable by the following:

(1) A fine not exceeding one hundred dollars ($100) for a first violation.

(2) A fine not exceeding two hundred dollars ($200) for a second violation of the same ordinance within one year of the first violation.

(3) A fine not exceeding five hundred dollars ($500) for each additional violation of the same ordinance within one year of the first violation.

(c) Notwithstanding any other law, a violation of local building and safety codes that is an infraction is punishable by the following:

(1) A fine not exceeding one hundred thirty dollars ($130) for a first violation.

(2) A fine not exceeding seven hundred dollars ($700) for a second violation of the same ordinance within one year of the first violation.

(3)(A) A fine not exceeding one thousand three hundred dollars ($1,300) for each additional violation of the same ordinance within one year of the first violation.

(B) A fine not exceeding two thousand five hundred dollars ($2,500) for each additional violation of the same ordinance within two years of the first violation if the property is a commercial property that has an existing building at the time of the violation and the

violation is due to failure by the owner to remove visible refuse or failure to prohibit unauthorized use of the property.

(d)(1) Notwithstanding any other law, including subdivisions (b), (c), and (e), a violation of an event permit requirement that is an infraction is punishable by the following:

(A) A fine not exceeding one hundred fifty dollars ($150) for the first violation of an event permit requirement.

(B) A fine not exceeding seven hundred dollars ($700) for a second occurrence of the same violation of an event permit requirement by the same owner or operator within three years of the first violation.

(C) A fine not exceeding two thousand five hundred dollars ($2,500) for each additional occurrence of the same violation of an event permit requirement by the same owner or operator within three years of the first violation.

(2)(A) For purposes of this subdivision, "violation of an event permit requirement" means failure to obtain a permit required for a professionally organized special event on private property that is commercial in nature, or from which the owner or operator derives a commercial benefit.

(B) For purposes of this paragraph, the following definitions apply:

(i) "Commercial in nature" means that a primary purpose of the special event is to derive an economic benefit resulting from the holding of the event through admission charges or sales of merchandise that occur as part of the event.

(ii) "Commercial benefit" means any remuneration received in exchange for allowing the property upon which the event occurs to be used for the event, including any remuneration that results from the rental of the property for a term of less than 31 consecutive days.

(e)(1) Notwithstanding any other law, including subdivisions (b), (c), and (d), the violation of a short-term rental ordinance that is an infraction is punishable by the following:

(A) A fine not exceeding one thousand five hundred dollars ($1,500) for a first violation.

(B) fine not exceeding three thousand dollars ($3,000) for a second violation of the same ordinance within one year.

- 78 -

(C) A fine not exceeding five thousand dollars ($5,000) for each additional violation of the same ordinance within one year of the first violation.

(2) For purposes of this section, "short-term rental" means a residential dwelling, or any portion of a residential dwelling, that is rented to a person or persons for 30 consecutive days or less.

(3) For purposes of this section, "residential dwelling" means a private structure designed and available, pursuant to applicable law, for use and occupancy as a residence by one or more individuals. "Residential dwelling" does not include a commercially operated hotel, motel, bed and breakfast inn, or time-share property as defined by subdivision (aa) of Section 11212 of the Business and Professions Code.

(4) The fine limits set by this subdivision apply only to infractions that pose a threat to public health or safety. The fines described in this subdivision shall not apply to a first time offense of failure to register or pay a business license fee. Nothing in this subdivision limits the authority of a county, or city and county, to establish lower fines for specific violations by ordinance.

(f) A county levying a fine pursuant to paragraphs (2) and (3) of subdivisions (b) and (c), and paragraph (1) of subdivision (e), shall establish a process for granting a hardship waiver to reduce the amount of the fine upon a showing by a responsible party that the responsible party has made a bona fide effort to comply after the first violation, and that payment of the full amount of the fine would impose an undue financial burden on the responsible party.

## Cal. Gov't Code § 36900. Violation; offense; prosecution; action; penalty; hardship waivers

(a) Violation of a city ordinance is a misdemeanor unless by ordinance it is made an infraction. The violation of a city ordinance may be prosecuted by city authorities in the name of the people of the State of California, or redressed by civil action.

(b) Every violation determined to be an infraction is punishable by the following:

(1) A fine not exceeding one hundred dollars ($100) for a first violation.

(2) A fine not exceeding two hundred dollars ($200) for a second violation of the same ordinance within one year.

(3) A fine not exceeding five hundred dollars ($500) for each additional violation of the same ordinance within one year.

(c) Notwithstanding any other law, a violation of local building and safety codes determined to be an infraction is punishable by the following:

(1) A fine not exceeding one hundred thirty dollars ($130) for a first violation.

(2) A fine not exceeding seven hundred dollars ($700) for a second violation of the same ordinance within one year.

(3)(A) A fine not exceeding one thousand three hundred dollars ($1,300) for each additional violation of the same ordinance within one year of the first violation.

(B) A fine not exceeding two thousand five hundred dollars ($2,500) for each additional violation of the same ordinance within two years of the first violation if the property is a commercial property that has an existing building at the time of the violation and the violation is due to failure by the owner to remove visible refuse or failure to prohibit unauthorized use of the property.

- 81 -

(d)(1) Notwithstanding any other law, including subdivisions (b) and (c), the violation of a short-term rental ordinance that is an infraction is punishable by the following:

(A) A fine not exceeding one thousand five hundred dollars ($1,500) for a first violation.

(B) A fine not exceeding three thousand dollars ($3,000) for a second violation of the same ordinance within one year.

(C) A fine not exceeding five thousand dollars ($5,000) for each additional violation of the same ordinance within one year of the first violation.

(2) For purposes of this section, "short-term rental" means a residential dwelling, or any portion of a residential dwelling, that is rented to a person or persons for 30 consecutive days or less.

(3) For purposes of this section, "residential dwelling" means a private structure that is designed and available, pursuant to applicable law, for use and occupancy by one or more individuals. "Residential dwelling" does not include a commercially operated hotel, motel, bed and breakfast inn, or a time-share property as defined by subdivision (aa) of Section 11212 of the Business and Professions Code.

- 82 -

(4) The fine limits set by this subdivision apply only to infractions that pose a threat to public health or safety. The fines described in this subdivision shall not apply to a first time offense of failure to register or pay a business license fee. Nothing in this subdivision limits the authority of a city, or city and county, to establish lower fines for specific violations by ordinance.

(e) A city levying a fine pursuant to paragraphs (2) and (3) of subdivisions (b) and (c), and paragraph (1) of subdivision (d), shall establish a process for granting a hardship waiver to reduce the amount of the fine upon a showing by the responsible party that the responsible party has made a bona fide effort to comply after the first violation and that payment of the full amount of the fine would impose an undue financial burden on the responsible party.

**S.F. Admin. Code § 12Q2.16. San Francisco Airport Service Employees.**

"San Francisco Airport Service Employees" shall mean Employees who are covered employees under the Quality Standards Program adopted by the San Francisco Airport Commission, as may be amended from time to time.

**S.F. Admin. Code § 12Q.3. Health Care Accountability Components.**

(a)   Except as provided in subsection (d), with respect to each Covered Employee who either resides in San Francisco (regardless of where the Covered Employee provides services) or provides services covered by this Chapter 12Q in San Francisco, each Contracting Party shall do one of the following, at the Contracting Party's option:

(1)   Offer to the Covered Employee health plan benefits that meet minimum standards prepared by the Health Director and approved by the Health Commission. The minimum standards shall provide for a maximum period for each Covered Employee's health benefits to become effective, no later than the first of the month that begins after 30 days from the start of employment on a covered Contract, Subcontract, Lease or Sublease. The Health Commission shall review such standards at least once every two years to ensure that the standards stay current with State and Federal regulations and existing health benefits practices; or

(2)   For each Week in which the Covered Employee works the applicable minimum number of hours set forth in Section 12Q.2.9(a)

(definition of "Covered Employee"), pay to the City $2.80 per hour for each hour the Covered Employee is employed by the Contracting Party on the Contract or Subcontract or on property covered by a Lease, but not to exceed $112 in any Week. The City shall appropriate money received pursuant to this Subsection (a)(2) for the use of the Department of Public Health. The Department of Public Health shall use the monies appropriated for staffing and other resources to provide medical care for the uninsured. Beginning with fiscal year 2009-2010, and each following year, the Health Director shall propose adjustments to the hourly rate and weekly maximum fee provided in this Section, based on changes since the prior year in the Bureau of Labor Statistics Consumer Price Index for Medical Care in the San Francisco Bay Area or average Health Maintenance Organization (HMO) premiums in California. The Health Director shall submit the proposed adjustments to the Controller by March 1. The Controller shall make appropriate adjustments to the hourly rate and weekly maximum fee without further action by the Board of Supervisors. The adjusted hourly rate and weekly maximum fee shall take effect on July 1.

(3) Participate in a health benefits program developed by the Health Director in consultation with the Agency. The Health Director shall obtain Health Commission approval of the program before implementing it. The Health Director shall seek such approval within twelve (12) months after this Chapter is finally approved. Prior to implementation of the health benefits program provided in this Subsection (a)(3), each Contracting Party shall comply with Subsection (a)(1) or (a)(2). After the Health Director implements the program, in addition to the options provided in Subsections (a)(1) and (a)(2), Contracting Parties may satisfy their obligations under this Chapter by complying with the requirements of the health benefits program. In developing the program, the Health Director shall (i) attempt to make health coverage available for uninsured Covered Employees and, if feasible, any other person employed by a Contracting Party who works less than 20 hours per week on a City contract, or other uninsured City residents; (ii) use public health facilities to the maximum extent practicable; (iii) make the program economically viable; and (iv) provide a mechanism for funding which relies, as much as possible, on contributions by participating employers and employees.

(b)   Except as provided in subsection (d), with respect to each Covered Employee who does not reside in San Francisco, but who provides services covered by this Chapter 12Q at the San Francisco Airport or at the San Bruno Jail, each Contracting Party shall do one of the options set forth in subsection (a), at the Contracting Party's option.

(c)   With respect to each Covered Employee who does not reside in San Francisco, and does not provide services covered by this Chapter in San Francisco, at the San Francisco Airport or at the San Bruno Jail, each Contracting Party shall do one of the following, at the Contracting Party's option:

(1)   Offer to the Covered Employee health plan benefits that meet minimum standards prepared by the Health Director and approved by the Health Commission pursuant to Subsection 12Q.3(a)(1) above; or

(2)   For each Week in which the Covered Employee works the applicable minimum number of hours set forth in Section 12Q.2.9(a) (definition of "Covered Employee"), pay to the Covered Employee an additional $2.80 per hour for each hour the Covered Employee is employed by the Contracting Party on the Contract or Subcontract or on property covered by a Lease, but not to exceed $112 in any Week, to

enable the employee to obtain health insurance coverage. This represents the City's current estimate of the average cost of obtaining individual health insurance benefits. Beginning with fiscal year 2009-2010, and each following year, the Health Director shall propose adjustments to the hourly rate and weekly maximum fee provided in this Section, based on changes since the prior year in the Bureau of Labor Statistics Consumer Price Index for Medical Care in the San Francisco Bay Area or average Health Maintenance Organization (HMO) premiums in California. The Health Director shall submit the proposed adjustments to the Controller by March 1. The Controller shall make appropriate adjustments to the hourly rate and weekly maximum fee without further action by the Board of Supervisors. The adjusted hourly rate and weekly maximum fee shall take effect on July 1.

(d)   With respect to each Covered Employee who is a San Francisco Airport Service Employee, each Contracting Party shall do one of the following, at the Contracting Party's option:

(1)   Offer health plan benefits to the Covered Employee and the Covered Employee's dependents, with the following features:

(A) The health benefits shall include at least one plan that is offered at no cost to the Covered Employee, provides a level of coverage that is designed to provide benefits that are actuarially equivalent to at least 90% of the full actuarial value of the benefits provided under the plan, and provides coverage for all services described in the California Essential Health Benefit Benchmark Plan.

(B) A Contracting Party may offer additional health benefit plans, provided that each such health benefit plan offered shall provide a level of coverage that is designed to provide benefits that are actuarially equivalent to at least 80% of the full actuarial value of the benefits provided under the plan and to provide coverage for all services as described in the California Essential Health Benefit Benchmark Plan. If the premium costs of such additional health benefit plan are greater than the premium costs of a plan offered under subsection (d)(1)(A), a Covered Employee electing such a health benefit plan may be required to pay a portion of the premium costs. The Covered Employee's premium cost share shall be limited to not more than the difference between the premium costs of the most expensive plan offered under subsection (d)(1)(A) and the

premium costs of the health benefit plan that the Covered Employee elects under this subsection (d)(1)(B).

(C) The maximum period for each Covered Employee's health benefits to become effective shall be no later than the first day of the first month after 30 days from the start of employment as a San Francisco Airport Service Employee; provided, however, that if a Contracting Party elects to make monthly contributions for a Covered Employee pursuant to subsection (d)(2), health benefits shall become effective no later than the first day after the Contracting Party ceases making such contributions.

(D) The Covered Employee's health benefits shall, at a minimum, cover the Covered Employee, the Covered Employee's spouse or registered domestic partner, and the Covered Employee's child, which shall include any legally adopted child, recognized natural child, stepchild, foster child, and minor legal ward. Coverage for a child must be made available until the child reaches the age of 26, in accordance with 42 U.S.C. § 300gg-14(a), as may be amended from time to time.

(E)   Notwithstanding the Operative Date of Ordinance No. 235-20, if a Contracting Party elects to comply with Section 12Q.3(d) by providing health benefits under subsection (d)(1), such health benefits shall not be required to be in effect prior to April 1, 2021.

(2)   For each Week in which the Covered Employee works any hours as a San Francisco Airport Service Employee, make contributions for that Employee as specified below into an account established under Section 14.2 of the Administrative Code, as may be amended from time to time.

(A)   Contributions made pursuant to this subsection (d)(2) shall be $9.50 per hour, but not to exceed $380 in any Week, as of the operative date of the ordinance in Board File No. 201133, establishing this subsection.

(B)   Beginning with fiscal year 2022-2023, and for each following fiscal year, the Director of Health shall propose adjustments to the hourly rate and weekly maximum fee provided in this subsection (d)(2), based on changes since the prior year in the Bureau of Labor Statistics Consumer Price Index for Medical Care in the San Francisco Bay Area or in average Health Maintenance Organization

premiums in California. The Health Director shall submit the proposed adjustments, together with proposed adjustments under Section 12Q.3(a)(2), to the Controller by March 1. The Controller shall make appropriate adjustments to the hourly rate and weekly maximum fee without further action by the Board of Supervisors. The adjusted hourly rate and weekly maximum fee shall take effect on July 1.

(e)  A Covered Employee may voluntarily waive an offer of health plan benefits under this Section 12Q.3 using a waiver form approved by the Agency upon providing the Contracting Party proof of current health plan coverage. With respect to subsection (d) of this Section 12Q.3, such proof of current health plan coverage must include the Covered Employee's dependents. The Contracting Party must retain voluntary waiver forms and proof of health plan coverage for three years and must provide the Agency access to them upon request.

(f)  When preparing proposed budgets and requests for supplemental appropriations for contract services, City departments that regularly enter into agreements for the provision of services by nonprofit corporations shall transmit with their proposal a written confirmation that the

department has considered in its calculation the costs that the nonprofit cor-porations calculate that they will incur in complying with the Health Care Accountability Ordinance.

(g)  Notwithstanding the above, if, at the time a Contract, Subcon-tract, Lease, or Sublease is executed, the Contracting Party has 20 or fewer employees (or, in the case of a Nonprofit Corporation, 50 or fewer employ-ees), including any employees the Contracting Party plans to hire to implement the Contract, Subcontract, Lease, or Sublease, the Contracting Party shall not be obligated to provide the Health Care Accountability Com-ponents set forth in this Section 12Q.3(a), (b), or (c) to its Covered Employees. In determining the number of employees had by a Contracting Party, all em-ployees of all entities that own or control the Contracting Party and that the Contracting Party owns or controls, shall be included.

**S.F. Admin. Code § 12Q.5. Administration and Enforcement.**

…

(f)  In addition to any other rights or remedies available to the City under the terms of any agreement of a Contracting Party or under applicable law, the City shall have the following rights:

(1)   The right, at the discretion of the Agency, to charge the Contracting Party for any amounts that the Contracting Party should have paid to the City for hours worked by Covered Employees pursuant to Section 12Q.3(a)(2), (b), or (d), or to Covered Employees pursuant to Section 12Q.3(c)(2), together with simple annual interest of 10% on such amount from the date payment was due;

(2)   The right, at the discretion of the Agency, to assess liquidated damages as provided in Section 12Q.5.1 and 12Q.5.2;

(3)   The right, at the discretion of the Agency, to set off all or any portion of the amount that a Contracting Party is required to pay to the City pursuant to preceding Subsections (g)(1) and (2) against amounts due to a Contracting Party;

(4)   The right, at the discretion of the Contracting Department, to terminate the Contract or Lease in whole or in part;

(5)   The right, at the discretion of either the Contracting Department or the Agency, to bar a Contracting Party from entering into future Contracts or Leases with the City for three (3) years.

(6)   The right to bring a civil action against the Contractor to pursue the remedies provided by this Chapter and other applicable law. The

prevailing party shall be entitled to all costs and expenses, including reasonable attorney's fees.

…

## S.F. Admin. Code § 12Q.5.1. Additional Contract Requirements: Liquidated Damages.

Every Contract, Contract Amendment, Lease and Lease Amendment entered after January 1, 2006 shall contain provisions in which the Contracting Party agrees:

(1) To be liable to the City for liquidated damages as provided in this Section;

(2) To be subject to the procedures governing enforcement of a breach of the terms of a Contract, Contract Amendment, Lease or Lease Amendment which terms are required by this Chapter, as set forth in Section 12Q.5.2;

(3) That the commitment of Contracting Parties to comply with the requirements of this Chapter is a material element of the City's consideration for the agreement and that the failure of a Contracting Party to comply will cause significant and substantial harm to the City and the

public, which is extremely difficult to determine or quantify, and that the liquidated damages set forth in this Section are reasonable amounts to pay for the harm caused by the Contracting Party's non-compliance;

(4) That for failure to comply with the requirements of this Chapter, the Agency may require the Contracting Party to pay the City liquidated damages of up to one hundred dollars ($100) for each one-week pay period for each employee for whom the Contracting Party has either not offered health plan benefits or made payments as required by Section 12Q.3. The Agency shall adjust this amount proportionately for Contracting Parties that use a pay period other than one week;

(5) That for any failure to provide reports to the City or access to pertinent records, or any failure to cooperate with any audit, inspection or investigation conducted by the Agency, the Agency may require the Contracting Party to pay the City liquidated damages of up to one thousand dollars ($1000); and

(6) That while liquidated damages in the maximum amounts set forth in this Section are a reasonable estimate of the harm caused by

the Contracting Party's non-compliance with contractual provisions required by this Chapter, the Agency may determine that less than the full amount is warranted depending on the circumstances of each case. The Agency shall give due consideration to the following factors in determining the amount of liquidated damages: the size of the Contracting Party's business, the Contracting Party's good faith, the gravity of the violation, the history of previous violations, the failure to comply with record-keeping, reporting and anti-retaliation requirements, and the extent to which the imposition of liquidated damages would undermine the purpose of this Chapter by imposing unreasonable financial burdens on the Contracting Party, thereby restricting its ability to fulfill its obligations under this Chapter.